FLINT AND PERE MARQUETTE RAILWAY CO. *v.* DEWEY.

---

## Flint & Pere Marquette Railway Company v. George M. Dewey.

*Assignment of executory contract, effect of. . Agent, duty in letting contract. Fidelity required.* Certain bonds, executed by the F. & P. M. Railroad Company, were delivered to certain trustees, to be used in the construction and equipment of the Company's road. A portion of them were delivered by the trustees to the defendant, then President of the Company, with the expectation that he would deliver them to certain contractors with whom he made a contract on behalf of the Company for the construction of the road. The defendant still retained them after the election of his successor, and suit was brought to compel him to deliver them up. Defendant claimed that he had, directly after the contract was made, become the assignee of a part of the contract, and was now entitled to retain these bonds on account of such interest in them, and on the ground that his copartners were indebted to him.

It appeared from the evidence that the defendant, the Secretary, and another Director had been appointed a committee by the Company to let a contract for building and equipping the road. This committee entered into a preliminary contract with a certain party, and on the same day that party assigned to the defendant and the Secretary three-eighths of said agreement and four-tenths of a contract to be thereafter entered into; also providing that they should be at three-eighths the expense of negotiating the bonds of the Company, which were to be received by the contractor.

Afterwards the contract was executed, and three-eighths assigned to said defendant and the Secretary. The Board of Directors afterwards approved of the contract, but there was no evidence that they had any knowledge of the interest of the defendant or the Secretary in the same. In a suit by complainant against defendant, to compel the delivering up of said bonds, it was *held:*

1. Had the contract been valid and binding on the Company, and had the assign- ment been valid as to the contractor, still the assignment of this executory con- tract, yet wholly unperformed, and made without the knowledge of the Company, could not create a contract relation between the defendant and the Company, or give him any right to retain the bonds, or interfere in respect to them between the Company and the contractor.

2. If anything was due from the Company to the contractor, the Company would not, by reason of this assignment, become the debtors of the defendant; and for whatever claim he might have under the assignment, he must look to the assignor.

3. But under the facts as disclosed by the record, the transaction under which the defendant claims is clearly fraudulent and void, as against the complainant. It was his duty, (with the others appointed as a committee,) in letting the con- tract to use his best efforts and judgment to secure the best terms he could for the Company; but in joining with the contractor in taking this very contract, which they were employed to let, it became their interest to let the contract for the highest price.

4. In the assignment of the preliminary contract, the letting of the contract by the Company to the assignor was stated as the sole consideration of the assign- ment. This is a void and illegal consideration.

5. The principle of law, applicable to such a contract, renders it immaterial under the circumstances of this case, whether there has been any fraud in fact, or any injury to the Company. "Fidelity in the agent is what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal."—11 *Mich.* 222.

*Heard October 3d.     Decided October 16th.*

Appeal from Genesee Circuit, in Chancery.

The facts are stated in the opinion.

*Wm. L. Webber,* for complainant.

1. The defendant claims a right to hold these seven bonds as his own property, basing his claim on the assignment of a three-eighth interest in the contract for building the road, which assignment was made by Paul, the contractor, for the consideration that Dewey, as President, and Hazelton, as Secretary of the company, should, and did give Paul the con- tract for building the road at $30,000 per mile.

The defendant was President of the company from its organization, in 1857, to July 1860. He, with Hazelton and Drake, were appointed a committee by the Board of Directors, to let the contract for building the road. He, as President of

the company, had the general charge, superintendence and management of the business of the company. It was therefore his duty, while acting in that capacity, to act so as best to promote the interests of the company. In letting the contract for the building of the road, his duty required him to protect the interests of the stockholders by getting the work done as low as possible. But instead of this, he and Hazelton seem to have acted on the principle that the higher the price they could get any one to take it at, the better for themselves. They became in fact the contractors. They let themselves the contract.

Neither a court of equity nor of law can for a moment admit the existence of such a pernicious doctrine.—2 *Mich.* 192; 2 *Id.* 330; 11 *Id.* 222. 1 *Lead. Cas. in Eq., Fox v. Macreth,* (92) *and notes.*

The defendant assumes no responsibility under the contract; he is to be a mere recipient of profit.

His own testimony shows that he received these bonds, or the ones for which they were exchanged, on his own order as President, and with other bonds for use of the company.

2. The defendant cannot retain these bonds for any debt he may claim against the company, because 1st, he does not base his claim on that ground; 2d, the proof shows that he is in debt to the company on assessments.

Holding these bonds as he does, in fact for the company, but denying the right of the company, and fraudulently claiming them as his own property, it is proper that he should be charged in a court of equity as a trustee, and compelled to deliver them over to the proper officer for the benefit of the party for whose use he received them.

*Wm. Newton,* for defendant.

1. The bill cannot be sustained, as it is not necessary to prevent irreparable mischief, and the remedy at law is complete.—*Har. Mich.* 1; 12 *Mich.* 45.

A recovery in damages would be an adequate remedy

and if so there is no ground for the relief sought.—2 *Story*, *Eq. Jur.* §§ 703, 708.

2. The number of bonds shown to be in the actual possession of defendant is six. Three had been delivered to Baldwin or other parties, one to Robert P. Toms, one to Farwell.

The decree is erroneous and not warranted by the testimony.

*a.* In fixing the rights of complainant to bonds in the hands of Toms, as he is not made a party, and defendant is sued jointly with him in another cause where he had a right to be heard.

*b.* The six bonds were delivered to and held by defendant individually in lieu of others of former issue surrendered and outstanding, due from the Company to contractors.

3. If the bill can be sustained at all, it cannot without the addition of parties interested; Farwell and Toms, the former as party contractor to whom first bonds were issued, and the latter holding one of the bonds in controversy.

All persons materially interested in the subject matter should be made parties.—7 *Cranch*, 69, *note ;* 1 *Pet.* 299; 13 *Id.* 359; 24 *Me.* 20; 11 *Vt.* 290; 3 *Id.* 160; 7 *Con.* 342; 11 *Id.* 112; 4 *Cow.* 717.

4. Complainant claims that the defense is invalid for the reason that the contract of Dewey and Hazelton with Paul and others, set up in answer, is fraudulent. This we deny.

*a.* That question is not in issue.

A general replication is filed. The alleged fraudulent contract is not set up or avoided, or any relief asked against it in the bill; it is not stated in the bill, nor relief asked on that ground.—13 *Mich.* 367 ; 2 *Id.* 389, 560.

*b.* The rule of law that an agent can not act for himself and principal as laid down,—11 *Mich.* 222,—does not apply in this case. But see dissenting opinion of CAMPBELL J., and cases there cited, *p.* 230.

*c.* The testimony shows the contracts were let on regular estimates made by the engineer of the Railway Company, and no harm can ensue by Dewey and Hazelton having an

interest in the contract. They did not make the terms of the contract.

*d.* The bonds in controversy were issued solely to take the place of others which had already passed into other hands, and were outstanding against the company. Besides, the parties in interest holding stock in the road seem all, or nearly all, to have participated in the contract; and the defendant especially to have negotiated the means to build the road.

There was no fraud in the contract, and the bill should be dismissed.

*e.* The report of Myron H. Clark does not show that the bonds were delivered to Dewey as President, but to him individually.

CHRISTIANCY J.

The bill was filed to procure the surrender and delivery by the defendant to complainant of eleven bonds of one thousand dollars each, executed by complainant, with coupons attached, which bonds are a part of a much larger sum executed and intended to be used in the construction and equipment of complainant's road.

The bonds were secured by a deed of trust executed by the company to Myron H. Clark, Shepherd Knapp and James M. Edmunds. They were countersigned by the trustees, signed by the defendant (then and for some time after President of the company), and attested by Edmund H. Hazelton, Secretary, under the corporate seal, and were transferable by mere delivery from one holder to another.

The bill alleges that these eleven bonds were, by said Myron H. Clark, one of said trustees, delivered to the defendant, then President of the company; that they were, and still are the property of, and have not been disposed of by said company; that, while these bonds were thus in the hands of the defendant, as President, on the sixth day of July, 1860, Eber B. Ward was elected President of the company, and became entitled to the possession of these bonds; that defendant has

been duly requested by said Ward as President, and by the Board of Directors of the company, to deliver over said bonds to said Ward, as President; but that defendant, after having on different occasions promised to do so, finally refused and still refuses thus to deliver them; that he intends to convert them to his own use, and unless restrained by the order of the Court, he will wrongfully and fraudulently deliver over or dispose of the bonds to some other person or persons, to place them beyond the reach of complainant, so as to compel complainant to pay the full amount thereof. The bill also alleges the insolvency of defendant, and that he is indebted to the company to the amount of thirty thousand dollars for unpaid assessments on his stock in the company.

The defendant answers under oath, admitting the execution of the bonds as stated in the bill, and substantially (for it becomes unnecessary to notice all the special matters set forth in the answer) admits that seven of said bonds were delivered to him by said Clark, trustee, while he, defendant, was President, and that he still has six of them in his hands and under his control. But he denies that they were delivered to him *as* President of the company, or received by him in that capacity, but in his individual and unofficial capacity. And he claims the right to hold them as his own property under and by virtue of an interest in a contract made by the company with one Francis W. Paul, to which Paul, Farwell & Company afterwards became parties, for the construction and equipment of a part of the complainant's road.

This contract, dated October 23, 1857, with various amendments thereto; a preliminary agreement between the same parties, dated Sept. 8, 1857, and the assignment (or rather several assignments) by Paul to the defendant and E. H. Hazelton, of three-eighths of his interest in the contract, are referred to and attached to the answer. From these and the evidence in the case it appears that the defendant (then President), Edmund H. Hazelton, Secretary, and Morgan L. Drake, another Director of the company, were appointed a committee

to let a contract for building and equipping the road; and afterwards, on the eighth day of September, 1857, they, in the name and on behalf of the company, entered into a preliminary written agreement for that purpose with one Francis Wilson Paul, in which, among other things, it was provided that if said Paul should desire it, said company should within sixty days let to him by contract the construction and equipment of the road on the terms and conditions therein stated, as the basis of the contract. This preliminary agreement is signed by Paul individually, and by Dewey (the defendant), Hazelton·and Drake officially, as "Directors and Committee."

On the same day said Paul, by a written instrument, assigns to said George M. Dewey (the defendant), and said Hazelton "three-eighths of said" (preliminary) "agreement and four-tenths of a contract to be hereafter entered into," "said Dewey and Hazelton to be at three-eighths of the expense of negotiating said bonds," (referring to certain bonds of the company, which the agreement provided said Paul should receive, and which were to be negotiated by him).

On the same day, also, but whether before or after the assignment just mentioned does not appear, another instrument of assignment is executed in the same words, and identical with the first, except that it assigns but three-eighths instead of four-tenths of the "contract to be hereafter entered into," and is signed by said Dewey and Hazelton, as well as said Paul.

Both these assignments refer to and describe this preliminary agreement, and both on their face expressly state that agreement as the consideration of the assignment of it by Paul. No other consideration is stated, nor does any other appear by the evidence.

On the 23d day of October, 1857, the formal contract between Paul and the company, (contemplated by the preliminary agreement,) for the construction and equipment of the road, is executed by Paul in person under his seal, of the one part, and by the defendant, as President, and Hazelton, as

Secretary, on behalf of the company, and under its corporate seal. This contract, among other things, provides for securing and paying Paul by the issue of bonds, to be secured by a mortgage of lands; Paul to have the right to hypothecate the bonds and mortgage for the purpose of raising money; such hypothecation to be subject to approval and ratification of the Board of Directors.

This contract was amended on the same day of its date, by a supplemental agreement, executed by the same parties and in the same manner. On the same day also, Paul, by an instrument in writing, for the expressed consideration of one dollar, assigns three-eighths of the contract to said Dewey & Hazelton, they " to have three-eighths of the profit and loss, and to be at three-eighths of the expense of negotiating the sale of the bonds." This would seem to have been executed to remove any doubt which might otherwise have arisen, whether the former assignments, made before the formal contract, could have the effect to transfer an interest in the contract not yet *in esse.*

On the fifth day of April, 1859, the firm of Paul, Farwell & Co. seem to have joined with Paul in this contract, and a supplemental agreement of that date was executed by Paul individually, and Paul, Farwell & Co., of the one part, and the complainant on the other; the defendant as President, and Morgan L. Drake, as Secretary, executing on the part of the company, under the corporate seal.

Though the Board of Directors had estimates made by their engineer of the probable cost of building and equipping the road, and approved the contract after it was made, there is nothing in the evidence tending to show that at the time of their approval they had any knowledge or notice of the personal interest of the defendant, and Hazelton, or either of them, in the contract. The only directors who testify on this point (Boss and Pierson), say they were ignorant of it, until a long time after. Dewey and Hazelton (being President and

Secretary), were the most prominent, and, therefore, probably the most influential members of the board.

These bonds, (or rather the bonds of a former issue, which were surrendered by the defendant, and for which these were substituted, and stood in all respects upon the same footing as regards the rights of the defendant,) were, as shown by the evidence, and as the defendant himself testifies, issued and put into the hands of the defendant, then President, for the purpose of being delivered to the contractors, Paul, Farwell, & Co., from time to time, upon the order and direction of the President, and for which said contractors were to account to the company. It appears also that he received the bonds upon his own order, as President. There is no proof that Paul, Farwell, & Co., the contractors, requested him to hold the bonds for · them, or against the company, or its subsequently elected President, nor that they ever assented to his thus holding them. The contrary is inferrible from the testimony. He does not claim to hold the bonds in their right, but in his own, as a party in interest in the contract, and "retained by him as a part of his interest under said contract, and the property of which became vested in him."

The defendant, at the time he refused to deliver these bonds to his successor, was, and so far as the evidence shows, still is, indebted to the company in a considerable amount for unpaid assessments on his stock.

The record contains a mass of other matters, but the facts above stated are all which are essential to the decision of the case, and the effect of these is in no way changed or modified by the other matters not included in the above statement.

To state such a case, is, it seems to us, to decide it. The claim of the defendant to hold these bonds as against the company cannot be sustained, for several reasons. Had the contract in question been valid and binding upon the company, and the assignment of the undivided interest to defendant and Hazelton valid, as between them and Paul, still we do not see how the assignment to them of an undivided

interest in this executory contract, yet wholly unperformed, and upon which nothing had become due, to which the complainant did not assent, and of which it was ignorant, could create any contract relation between the defendant and the complainant, or give him any right of action, or of offset as against the company, or any right to retain the bonds, or to interfere in respect to them in any manner between the company and the contractors, under the facts presented by the present case.

If any thing was due from the company to the contractors, the company would not, by reason of this assignment, become the debtors of the defendant, and for whatever claim he might have under the assignment, he must look to the assignor.

But, judging of this case only from the record, the contract and the assignment, under which the defendant claims, were, under the circumstances disclosed by the case, so clearly fraudulent and void, as against the complainant, that it seems almost a waste of words to comment upon them. Nothing could render this clearer than a bald statement of the facts upon which the defendant relies for a defense, the only merit of which consists in the frankness with which the vicious transaction is avowed and relied upon.

The defendant and Hazelton, President and Secretary of the company, with Drake, another Director, are appointed a committee for the purpose of letting a contract for the construction and equipment of the road. It was their duty in letting the contract, to use their best efforts and their best judgment to promote the interests of the company by securing the best terms they could obtain for the company. But they (the defendant and Hazelton, for it does not appear that Drake was aware of their personal interest), at once, and in the very act of letting the contract, put themselves in the interest of the other contracting party by clandestinely joining with him in taking the very contract they were employed to let, and pretended to be letting for the company; a position in which it became their interest to let the contract for the highest price

they could get it taken at, and on the best terms for themselves and their confederate. While they are pretending to let the contract to another, they are surreptitiously taking it, or a large part of it, in the name of another party. In the making of such a contract it may well be supposed there would not be likely to be any serious difficulty in agreeing upon the terms. They would clearly have it in their power to afford to the party nominally taking the contract advantages of considerable value, as well to him, as to themselves. Accordingly, we find both instruments of assignment, executed to them by Paul at the time of the preliminary agreement, state that agreement itself as the consideration received by Paul for the assignment of three-eighths of it to Dewey and Hazelton, as well as of a like interest in the contract afterwards to be made.

It is not easy to see how the letting of the contract by the company could be any consideration to Paul for its assignment to Dewey and Hazelton, if the letting were an honest one; but if, through their influence, Paul had been allowed to obtain the contract on better terms than he otherwise could, then the mystery is solved, and the value of the consideration moving from Dewey and Hazelton becomes apparent. If this was the consideration (and no other is stated or proved), it was void and illegal.

But it is idle to multiply words upon such a defense; certainly nothing short of a ratification by the board, after a full explanation and knowledge of their interest and of all the circumstances, could render such a contract binding upon the company. And I think it at least questionable whether a ratification by the board with such knowledge could render it valid, while Dewey and Hazelton remained influential members of the board, especially if they took any part in such ratification. But, as there does not appear to have been any such ratification, we need not discuss this question.

It is possible there may have been no actual fraud, and that the contract could not have been let on better terms, but the principle of law applicable to such a contract renders it imma-

terial, under the circumstances of this case, whether there has been any fraud in fact, or any injury to the. company. "Fidelity in the agent is what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal."—Per MANNING J. in *People v. Township Bd. of Overyssel,* 11 *Mich.* 225. And " if such contracts were held valid until shown to be fraudulent and corrupt, the result, as a general rule, would be that they must be enforced in *spite of fraud and corruption.*"— *S. C. p.* 228.—See, also, *Clute v. Barron,* 2 *Mich.* 192; *Dwight, et al. v. Blackmar,* 2 *Id.* 330; 1 *L. Cas. in Eq.* (*Fox v. Mackreth,*) 92, *and notes.*

From the evidence in the case we think all the eleven bonds in question were, as between the complainant and defendant, the property of the complainant. That he holds six of these bonds, which the evidence and his own admission show to be still in his possession and under his control, as a mere naked trustee for the complainant; and these bonds being in effect negotiable, transferable by mere delivery, and the defendant seeking, and claiming the right to hold and dispose of them as his own, the complainant is clearly entitled to a decree for their surrender and delivery, according to the prayer of the bill.

The decree of the court below to this effect must, therefore, be affirmed, with costs.

COOLEY J. concurred. The Chief Justice was absent.

CAMPBELL J.

Whether the contract and assignment referred to were good or bad, I think Dewey was not in a position to retain the bonds for his own use. I express no opinion upon the validity of the transactions referred to by my brother Christiancy, but concur upon the first ground stated.