## MEEKER and others *v.* WINTHROP IRON Co. and others.[1]

### (*Circuit Court, W. D. Michigan, N. D.* June, 1883.)

1. OFFICERS OF A CORPORATION DEALING WITH THEMSELVES—CONTRACT VOIDABLE.

Officers of a corporation are but agents, and cannot, as such officers, while acting for the corporation, deal with themselves, to the detriment of the corporation for whom they are acting. All such contracts, if not void, are voidable at the option of the corporation.

2. SAME—EFFECT OF STOCKHOLDERS' MEETING.

Nor can the holders of a majority of the capital stock of a corporation, by *their votes* in a stockholders' meeting, lawfully authorize its officers to lease its property to themselves, or to another corporation formed for the purpose and exclusively owned by them, unless such lease is made in good faith, and is supported by an adequate consideration; and in a suit, properly prosecuted, to set aside such a contract, the burden of proof, showing fairness and adequacy, is upon the party or parties claiming thereunder. All doubts will be solved in favor of the corporation for whom such stockholders assumed to act.

3. SAME—POWER OF MAJORITY.

The holders of a majority of the stock of a corporation may legally control the company's business, prescribe its general policy, make themselves its agents, and take reasonable compensation for their services. But, in thus assuming the control, they also take upon themselves the correlative duty of diligence and good faith. They cannot lawfully manipulate the company's business in their own interests, to the injury of other stockholders.

4. COSTS—COUNSEL FEES.

An owner of capital stock in a corporation, who sues for himself and all other shareholders, and successfully prosecutes the action, for a wrong done to the corporation, is entitled to be reimbursed his actual and necessary expenditures, including attorney's fees, out of the corporate funds.

5. SAME—CASE STATED—RELIEF GRANTED.

The four brothers S. leased the mine of the W. Iron Co. for five years, at a royalty of 50 cents per ton of ore mined, they to furnish the requisite machinery, which was to be purchased by the lessor upon the expiration of the lease. They incorporated the W. Hematite Co. to operate the mine, they being the sole owners of its stock. Shortly before the expiration of their lease, being unable to obtain a renewal of it, they purchased a majority of the stock of the W. Iron Co., and called a meeting of its stockholders, but at which no other stockholder attended. That meeting ordered an expenditure of $50,000 of the company's capital in sinking a shaft in the mine to facilitate its operation; directed a lease for 18 years of the mine, machinery, and all of the company's other property to the W. Hematite Co. at a royalty of 25 cents per ton of ore mined, with certain

1 Reported by J. C. Harper, Esq., of the Cincinnati bar.

other advantages to the lessee; voted one of the brothers a salary of $3,000 a year as president; and in pursuance of said action such a lease was executed by two of the brothers, acting as president and secretary of the W. Iron Co., and by the other two acting as secretary and superintendent of the W. Hematite Co. Upon a bill filed by stockholders in behalf of themselves and all other stockholders, *held*, that such a lease was inequitable, and a fraud upon the rights of stockholders not concurring therein.

In Equity.

*Morris & Uhl*, for complainants.

*C. T. Walker* and *Mr. Crocker*, for defendants.

BAXTER, J. The defendants, the Winthrop Iron Company and the Winthrop Hematite Company, are corporations organized under the laws of Michigan. The capital stock of the former consists of an iron ore mine rated at $500,000. In August, 1877, it made a lease thereof to the St. Clair Brothers, a partnership composed of the four defendants by that name sued herein. Soon after securing said lease they organized the Winthrop Hematite Company, for the purpose of working the mine thereunder. They continued thus to operate until the summer of 1881, when they made an effort to obtain a renewal thereof to the Winthrop Hematite Company. But failing to secure it, they proceeded to purchase a majority of the capital stock of the Winthrop Iron Company, and assume control of its business. At their instance a stockholders' meeting was called for October, 1881. The meeting was accordingly held by one of the St. Clairs, (who acted for himself and brothers,) assisted by W. S. Hollert, their attorney, and one G. B. Breese. Neither Hollert nor Breese owned any stock in the company. Hollert was made president, and Breese secretary, of the meeting. Being thus organized they adopted certain resolutions, in which, among other things, they removed two directors of the company, and appointed three of the St. Clairs in their stead; authorized the sinking of a shaft at the mine, and appropriated $50,-000 of the company's money to complete and equip it; authorized and directed a lease of the company's mine for 18 years from and after December 1, 1882,—the time at which the former lease was to expire,— to the Winthrop Hematite Company; and soon thereafter Eugene G. St. Clair as president, and J. N. St. Clair as secretary, of the Winthrop Iron Company; and Eugene G. St. Clair as secretary, and George A. St. Clair as superintendent, of the Winthrop Hematite Company, professing to act for and in behalf of their respective companies, entered into a contract wherein and whereby it was agreed that said first company should lease its mine, with all the improvements, machinery, etc., thereon, for 18 years to the Winthrop Hematite Company at a royalty of 25 cents per ton.

The relief sought by complainants, who sue as well for all other stockholders in the Winthrop Iron Company as for themselves, is a rescission of said lease and an account of rents and profits; and to

this end they have, through their solicitors, invoked that well-established principle so uniformly enforced by courts of equity, which forbids agents from dealing with themselves or with other persons for their private benefit, to the detriment of their principals. Is the principle applicable to the facts of this case?

The lease sought to be rescinded is not to the St. Clairs, but to the Winthrop Hematite Company. But who is the Winthrop Hematite Company? A mere entity created by law, without body or soul, endowed with capacity to acquire, hold, and dispose of property, in trust for the use and benefit of the natural persons of whom it is composed, in proportion to their several interests therein. But its property belongs in equity to the corporators, and every contract that wrongfully deprives the corporation of any part thereof, or diminishes its value, is an injury to its beneficial owners. Hence, courts of equity look beyond the artificial creature in whom the legal title is vested, to the real persons which it represents.

The defendants St. Clair were, at the time the lease was executed, and are yet, the owners of all the capital stock of the Winthrop Hematite Company. If any profits or other advantage resulted therefrom, it inured to them, to the same extent as if the lease had been made directly to them. Hence, in executing said lease for the Winthrop Iron Company to the Winthrop Hematite Company, they were, in a beneficial sense, dealing with themselves; and we can see no reason for withholding the application of the principle invoked and hereinbefore stated, unless its application is averted by the stockholders' resolution hitherto mentioned, and under and by authority of which, as it is alleged, the lease was executed.

Does this resolution validate and make effectual a contract that would otherwise be declared void?

The ownership of a majority of the capital stock of a corporation invests the holders thereof with many and valuable incidental rights. They may legally control the company's business, prescribe its general policy, make themselves its agents, and take reasonable compensation for their services. But, in thus assuming the control, they also take upon themselves the correlative duty of diligence and good faith. They cannot lawfully manipulate the company's business in their own interests to the injury of other corporators. Any contract made by them in behalf of their principal with themselves or with another for their personal gain would be voidable at the option of the company. We may, therefore, admit that the stockholders' meeting of October, 1881, was legally called and regularly convened, (facts; however, denied by the complainants;) that it possessed the power to displace two of the existing directors and of electing three of defendants in their stead; to direct a lease of the company's mine, and dictate the company's general policy within the scope of its chartered priviliges; and yet defendants would be without the legal right to appro-

priate the corporate property to themselves or to make any other disposition of it for their private benefit. If they could, they would be, in effect, the beneficial owners of the entire corporate property. If they can make such a lease, they can, as selfishness or caprice shall dictate, modify its terms, expend the company's entire income in improvements to facilitate their individual interests, or do anything else their selfishness or cupidity may suggest. The law does not thus vest majority stockholders with any such dangerous power, invite such peculations, or open the door to such abuses. If a majority of stockholders can, in any event and under any circumstances, thus vote away the corporate property to their individual uses,—a question that need not be decided in this case,—they could only do so upon the clearest and most satisfactory evidence of good faith, and for an adequate consideration; and the burden of proof is upon the parties thus acting and claiming the enforcement of such a contract. All doubts in relation to adequacy of consideration and good faith ought to be resolved in favor of the principal. Was the lease in question, therefore, fairly obtained, and is it supported by a just and adequate consideration?

On these points the testimony is not susceptible of easy reconciliation. It consists mainly of the opinions of professed experts and interested witnesses; the witnesses for complainants generally concurring in the opinion that the royalty contracted for in the second lease is grossly inadequate; while those for defendants unite in the opinion that the rent agreed on is a sufficient consideration for the leased premises. Each witness endeavors to fortify his opinion with such extraneous facts as seemed to him to be material and pertinent to the issue. But fortunately the court is not entirely without other evidence bearing on these questions. It appears that the defendants St. Clair are experienced and successful business men. In 1877, with a full knowledge of its condition, resources, and capabilities, they applied for and obtained a five years' lease of said mine, and therein agreed to pay a royalty of 50 cents per ton. By it they obtained nothing but a lease of the mine. The lessor was under no obligation to make any improvements or furnish machinery. These facilities were to be provided by the lessees, the lessor covenanting to purchase the same upon the expiration of the lease, at such price as might, in case of a disagreement between the parties, be fixed by arbitration. This contract sufficiently evinces the defendant's estimate of the mine at that time. Nothing has since been developed in connection therewith calling for any radical change of opinion in this regard; and yet, after more than three years of actual experience in working the mine under that lease, the defendants, for the purpose of securing another lease of the same property, resorted to the means hereinbefore detailed to obtain it; and, after having thus secured absolute control of the corporation to which it

belonged, by their votes as stockholders, authorized and directed themselves, as the officers and agents of the company, to make and execute a lease of said premises to another and distinct corporation, wholly owned by them and for their exclusive benefit, at one-half the royalty contracted for in the first lease, provided a sufficient quantity of ore could be found accessible without an unreasonable outlay of money.

It seems that a reduction of one-half the royalty agreed to be paid under the first lease ought to have been accepted as a sufficient concession. But it did not satisfy the defendants. They demanded more, and being, as they supposed, in full possession of the requisite power, they dealt in a most generous spirit with themselves. The second lease, conforming to the requirements of the resolution passed by their votes, included, in addition to the mine, from $30,000 to $40,000 worth of machinery, (which the lessor company was, under the terms of the first lease, bound to purchase,) and the $50,000 of money appropriated for the purpose of sinking and equipping a shaft to put the mine in a more workable condition to facilitate their operations. Interest on these two sums, ordinary deterioration of the machinery, the $3,000 salary allowed to one of the defendants for acting as president of a corporation stripped of its property and left without any active business or responsibility, will about absorb all the rent payable under said second lease. Its effect, therefore, is to transfer the beneficial interest of all the company's property to defendants for 18 years. But if, perchance, it does not do this, another stockholders' meeting, to be called and controlled by defendants, can easily find some pretext for appropriating any surplus that may remain. A lease thus attained, and capable of being perverted to such injustice, ought not to be sustained. It is inequitable, and a fraud upon the rights of the other stockholders. A decree will, therefore, be entered declaring it fraudulent, and ordering its rescission, and appointing a receiver to take charge of and superintend the company's business, until the accounts hereinafter ordered and the rights of the parties involved herein are ascertained and finally adjusted. The defendants St. Clair will also be required to account with the Winthrop Iron Company, pursuant to the terms of the first lease, until December 1, 1882, the date of its expiration, and from and after that time for the actual profits realized by them from said mine, or for a reasonable royalty, at complainants' election. Said defendants will also be decreed to pay the costs heretofore accrued. And as the complainants have prosecuted this case for the common benefit of all the parties interested, to protect and preserve a trust fund, they are entitled to be reimbursed therefrom for all proper expenditures made or liabilities necessarily incurred in and about the prosecution of the same. A master will, therefore, be appointed to hear proof, and take and report in reference to the accounts hereinbefore ordered, and to ascertain what will be a proper allowance to complainants for their

counsel fees and other necessary expenditures made or to be made by them in and about the prosecution of this suit.

All other questions will be reserved until the coming in of the master's report.

---

The main position in the case above given rests on the rule that a principal may, at his election, avoid a contract made by his agent when such contract reserves emoluments or benefits to the agent which should have been given to the principal. The profit that an agent is permitted to make out of his agency is limited to salary and commissions fixed by law or by agreement of the parties. Hence, any contracts by an agent for the purchase of the principal's property, or the investment of the principal's assets, inures to the principal's benefit; or, if it be the result of a speculation by the agent for his private gain, it may be repudiated by the principal, so far as concerns the agent and parties with notice, unless it should appear that the speculation was made with the principal's approval, on a full knowledge of the facts.(a) The reasons for vacating such contracts increase in strength when the agent, from his peculiar position, is enabled to exercise peculiar influence over the principal, as is the case when a director or officer of a company makes a contract on behalf of the company for his own emolument;(b) or a trustee, relied on implicitly by the *cestui que trust*, makes an unfair profit out of the latter's estate.(c) Nor is this all. An agreement by an officer of a railroad company to use his influence to have the road take a particular course, is not only voidable as against the company, but void generally, as against public policy.(d) "All arrangements by directors of a railroad company to secure an undue advantage to themselves, at its expense, * * * are so many unlawful devices to secure an undue advantage to enrich themselves to the detriment of the stockholders and creditors of the company, and will be condemned whenever properly brought before the courts for consideration."(e) And in a later case, still unreported, (f) it was held that an agreement, for a consideration, of a stockholder in a business corporation to vote for a particular person as manager, and to vote to increase the salaries of the officers, including that of the manager, is void, as against public policy, if not cured by the assent of all the stockholders.(g)                FRANCIS WHARTON.

(a) Lees v. Nuttall, 2 Myl. & K. 819; Lowther v. Lowther, 13 Ves. 95; Dunne v. English, L. R. 18 Eq. 524; Marsh v. Whitmore, 21 Wall. 178; Baker v. Humphreys, 101 U. S. 491; Mott v Harrington, 12 Vt. 199; Smith v. Townsend, 109 Mass. 500; Fulton v. Whitney, 66 N. Y. 548; Lorillard v. Clyde, 86 N. Y. 384; Everhart v. Searle, 71 Pa. St. 256.

(b) Imperial Merc. Co. v. Coleman, L. R. 6 H. L. 189; Flanagan v. Railroad, L. R. 7 Eq. 116; New Sombrero Phosphate Co. v. Erlanger, L. R. 5 C. D. 73.

(c) Coles v. Trecothick, 9 Ves. 234; Ellis v. Barker, L. R. 7 Ch. 104; Thompson v. Eastwood, L. R. 2 App. Cas. 236; Parker v. Nickerson. 112 Mass. 495; Hunt v. Moore, 2 Barb. 105; Diller v. Brubaker, 52 Pa. St. 498; Spencer's Appeal, 80 Pa. St. 332.

(d) Berryman v. Railroad, 14 Bush, 755.

(e) FIELD, J., Wardell v. Railroad, 103 U.S. 658; citing Great Luxembourg R R. v. Magney, 25 Beav. 586; Benson v. Hathaway, 17 S. C. 326; Flint R. R. v. Dewey, 14 Mich. 477.

(f) Woodruff v. Wentworth, Sup. Ct. U. S. 1883.

(g) See Guernsey v. Cook, 120 Mass. 501.