THE FIRST NATIONAL BANK OF FORT SCOTT V. C. F. DRAKE.

1. OFFICER OF CORPORATION, *Compensation of.* Where directors of a corporation appoint one of their number to act as treasurer, secretary, or other ministerial officer of the corporation, he is *prima facie* entitled to reasonable compensation for his services as such officer.

2. EXPRESS CONTRACT *as to Compensation, Controls.* Where he assumes the duties of such ministerial office upon an express contract as to compensation, such contract controls, and this though the contract is to discharge the duties without any direct compensation in money.

3. PURCHASE OF CORPORATE PROPERTIES, *When not Upheld.* An agent of a corporation, who, as an individual, purchases the properties of the corporation from himself as agent, cannot uphold such purchase by proof that he agreed to pay what he thought the property was worth, but is liable' to the corporation for the actual value of the property so by him purchased.

4. RATIFICATION; *Knowledge.* Ratification implies knowledge, and a party cannot be adjudged to have ratified an act of which he has no knowledge, actual or constructive.

5. PRESUMPTIVE KNOWLEDGE *of Directors, Nature and Purpose of.* The doctrine that the directors of a bank are conclusively presumed to know the financial condition of the bank, its general business, and its receipts and expenditures as shown by its regular books, is for the protection of third parties dealing with the bank, and of the bank against the prejudicial action of any directors, and cannot be invoked to uphold a wrongful appropriation of moneys by the cashier or other officer, which appropriation is made and also entered upon the books of the bank without the actual knowledge of the directors.

6. A BANK — *Action Against Cashier; No Defense.* It is no defense to an action brought by a bank against its late cashier for a wrongful appropriation of moneys, that at the time of such appropriation he was the owner of four-fifths of the stock of the bank, and has since that time sold all of said stock to other parties, who are now the officers and managing authority of the bank.

*Error from Bourbon District Court.*

ACTION brought by the *First National Bank of Fort Scott* against *C. F. Drake,* to recover certain moneys claimed to have been wrongfully appropriated by him while acting as an officer of the plaintiff bank. At the December Term, 1881, of

the district court, W. C. W., judge *pro tem.*, presiding, at the close of the plaintiff's evidence a demurrer thereto was sustained, and judgment entered for defendant.    The plaintiff brings the case to this court.    The opinion sufficiently states the facts.

*Ware & Ware,* and *J. D. McCleverty,* for plaintiff in error.

*A. A. Harris,* and *Blair & Perry,* for defendant in error.

The opinion of the court was delivered by

BREWER, J.: This was an action in the district court of Bourbon county, brought by plaintiff in error, plaintiff below, to recover of defendant money claimed to have been wrongfully appropriated by him while acting as officer of said plaintiff bank.    The case was tried by the court, with a jury. At the close of plaintiff's evidence a demurrer thereto was sustained, and judgment entered in behalf of the defendant; and now the plaintiff brings the record here for review. There are three separate transactions alleged in the petition, and supported by the testimony, in respect to each of which the plaintiff claims the right to recover.    The facts are these: The plaintiff since 1871 has been a national bank, incorporated under the laws of congress.    During all of the transactions hereinafter stated, defendant was one of its directors. Prior to May 7, 1877, one L. C. Nelson had been its cashier, under a salary prescribed by the board of directors, of $1,800 per annum.    At that time he resigned, and defendant was appointed his successor, and continued to act as cashier until July 7, 1880.    The plaintiff claims (1) that this change of cashier was made in the interest of economy, and upon the agreement on the part of defendant that if he could have office room in the bank building for the transaction of his private business, and could keep his private safe and papers there, he would discharge the duties of cashier without compensation; and that, notwithstanding this agreement, the defendant did charge up on the books of the bank and appropriate to himself the sum of $3,165.50 as salary as cashier.    The

bank claims (2) that, by one of its rules, no interest was payable on demand certificates of deposit; that this rule was known to the defendant as its cashier, and enforced by him generally as to third parties; but that, notwithstanding this, he caused to be issued to himself demand certificates drawing large interest, and took thereon from the funds of the bank as interest on such certificates the sum of $2,203.97; and (3) that the bank was the owner of $10,000 of Bourbon county bonds, for which it had paid $9,314.80, and that the bonds were at the time of the following transaction worth par and accrued interest; that, as officer of the bank, defendant sold these bonds to himself for $9,300 — $14.80 less than the bank paid for them, and $846.66 less than they were worth.

These are the three matters of which the plaintiff complains, and in support of which it offered testimony. We shall not attempt to review the testimony, or state in detail what it was. It is enough to say that there was testimony tending to sustain the plaintiff's claim; testimony from which a jury might find the facts to be as alleged. We do not say that the jury must necessarily have found them to be so, but simply that they might have so found them. Hence, for the purposes of this inquiry, they must be taken as so found, for it is a familiar rule in respect to demurrers to evidence, that they can be sustained only when upon any and all facts which may properly be found by the jury from the testimony presented, the plaintiff, as matter of law, is not entitled to recover. So, without attempting to weigh or compare conflicting matters of testimony, or to conjecture what the jury would probably have found to be the facts, it must be accepted for the purposes of the present inquiry as true, (1) that defendant was appointed and accepted the position of cashier upon the agreement that he would discharge its duties without compensation, other than office, safe and desk room for his private business; and, notwithstanding such agreement, actually took and appropriated to himself of the funds of the bank the sum stated as compensation; (2) that the rules of the bank, known to himself, forbade interest on demand cer-

tificates; that, in defiance of those rules, he caused to be issued to himself demand certificates drawing interest, and actually took from the funds of the bank the sum stated as interest on such certificates; (3) that, as an officer of the bank, he sold the Bourbon county bonds, worth par and accrued interest, as above stated, to himself for $846.66 less than they were worth.

These being facts, can the plaintiff recover? and if not, what legal obstacle to recovery appears? The defendant, denying of course some of the facts above stated, claims that even if they be literally true, all the transactions were duly entered on the general books of the bank, open to the inspection of the officers and directors; that in law the directors are conclusively presumed to have known the fact of these entries, as well as his entire action in respect to these matters, and that thereby they acquiesced in and ratified his action. In other words, that the directors might in the first instance have bound the bank by giving him the sum taken as salary; and that, knowing he was so taking it, they acquiesced in and ratified the act, which is the same as though in the first instance they had contracted to give it to him. Also, that they could lawfully and properly agree to pay interest on demand certificates as well as upon any other indebtedness of the bank; that if they deemed the interests of the bank required, they could pay interest to one party and not to another. In short, that their judgment as to the best interest of the bank in the matter of interest was finally conclusive, and that their knowledge that he was taking such certificates and such interest was equivalent to a direct authority therefor, and bound the bank to the same extent that a prior resolution directing it would. And also, that they had power to sell any of the properties of the bank for such a sum as they deemed best; that their action could not be repudiated by the bank simply by proof that the property was in fact worth more than they received; and their knowledge that the property was sold for such a sum, is equivalent to a sale directly by their authority. Furthermore, it is con-

tended that during all these transactions, the defendant was a large owner of the stock in the bank; that at the time of the bond matter, he in fact owned over four-fifths of the stock, which, in October, 1880, he sold; and that the purchaser then bought into the bank, taking the assets as they were, and with no right to challenge prior transactions between the bank and its officers. As the learned court, before whom the case was tried, said in the opinion sustaining this demurrer:

"Drake himself was practically the bank; its assets and its property were his; the profits, if any, were his; the losses, if any, were his; and he could do with his funds and assets just what he pleased; but of course, as before stated, he could not mismanage or misappropriate the funds of the bank against any depositor, or creditor, not consenting; and if he should do so, the law could, and in a proper action would, redress their grievances. But no *cestui que trust* is alleging any grievance here. The action is brought in the name of the bank by the present owners, who purchased the bank from Mr. Drake himself; and without alleging any fraud upon themselves in their purchase, without alleging that they did not obtain all they purchased, they seek to recover what they did not buy nor pay for, by going back and alleging that during his management he reduced the assets of the bank by paying himself a salary he was not entitled to; by paying himself interest upon deposits for which he held certificates; and by purchasing bonds from the bank at less than their value."

It will help to a clearer understanding of the questions involved, to consider the rights of the parties independent of the two matters of defense suggested, and here we find two propositions involved: (1) An agent contracting to work for his employer at a stipulated compensation, and being in possession of his employer's funds, appropriates a larger amount in payment of his services. (2) An agent acting on behalf of his principal, contracts with himself to the prejudice of the interests and against the instructions of his principal. The bare statement of these propositions is enough. If A agrees to work for B for $100 a month, that contract determines the limit of his compensation. The same rule ob-

tains if, instead of a money compensation, he contracts to work for office, desk and safe room. The contract measures both rights and obligations. The agent alone may not change it, and this notwithstanding his services may have been of incalculable benefit to his principal. His possession and control of the funds of his principal give him no added rights. A failure to return all funds and properties of such principal in excess of the stipulated compensation, gives to such principal a clear and undisputed right of action. Neither is the rule changed by the fact that the principal is an incorporation and the agent its chief executive and managing officer. These propositions are elementary. The authorities not only universally sustain them, but, in addition, in cases in which a director of a corporation is the agent seeking additional compensation, go far beyond them. In *Rld. Co. v. Richards*, 8 Kas. 109, the court says: "If the services were rendered with an understanding that they were gratuitous, then there could be no recovery."

In *Loan Association v. Stonemetz*, 29 Pa. St. 534, a director, Stonemetz, was chairman of the committee on short loans. The labor performed by him in that capacity was quite burdensome. No salary for these services had been agreed upon; but a year and a half after his appointment, the board of directors fixed the salary at $200 a year, this to date from the time he first acted, and issued him an order for $300 to pay for that back salary. Payment of the order being afterward refused, he brought suit and recovered in the lower court. The supreme court, in reversing this judgment, says, p. 536:

"We regard it as contrary to all sound policy to allow a director of a corporation, elected to serve without compensation, to recover payment for services performed in that capacity or as incidental to his office. It would be a sad spectacle to see the managers of any corporation, ecclesiastical or lay, civil or eleemosynary, assembling together and parceling out among themselves the obligations or other property of the corporation, in payment for their past services."

"The expectation of a director that he was to receive com-

pensation, there being no previous vote or promise, does not entitle him to it. The rule which excludes compensation, applies to the president chosen by the directors from their own number, and also to a treasurer, when a director." (Pierce on Railroads, 31.)

In *Citizens' National Bank v. Elliott*, Iowa, December, 1880, (7 Northwestern Rep.,) the vice president of a national bank rendered "valuable and efficient" services, worth $1,000, but the court said he could not recover, except his salary had been fixed or agreed upon beforehand by the board of directors of the bank. "A corporate officer who performs the duties of his position is not, in the absence of agreement with the corporation, entitled to any compensation therefor."

Nor can the directors, after the services have been performed, pay for such services, unless per contract theretofore made. The reason is, that the board cannot give away the money of the stockholders. They can be liberal or charitable with their own private funds, but as agents, cannot be liberal with money of their principals.

"A subsequent vote of the board to pay a director for his services, when there was no previous agreement, is not binding." (Pierce on Railroads, 31.)

See also *Chandler v. Bank*, 13 N. J. L. (1 Green), 255; *Rld. Co. v. Miles*, 52 Ill. 174; *Merrick v. Peru Coal Co.*, 61 Ill. 472; *Rld. Co. v. Sage*, 65 Ill. 328; *Cheney v. Lafayette Rld. Co.*, 68 Ill. 570; *Cheney v. Lafayette Rld. Co.*, 87 Ill. 446; *Linen Co. v. Hough*, 91 Ill. 63; *Henry v. Railroad Co.*, 27 Vt. 435; *Hall v. Rld. Co.*, 28 Vt. 401; *Hodges v. Rld. Co.*, 29 Vt. 220; *Fraylor v. Sonora Co.*, 17 Cal. 594; *Ins. Co. v. Crane*, 6 Metc. 64; *Rld. Co. v. Ketchum*, 27 Conn. 170; *Levisee v. Rld. Co.*, 27 La. An. 641; *Rogers v. Hastings & D. Rld. Co.*, 22 Minn. 25; *Santa Clara Mining Assoc. v. Meredith*, 49 Md. 389; *Bailey v. Buffalo*, 14 Hun, 483; *Jackson v. Rld. Co.*, 2 Thompson & C. 653.

In *Holder v. L. B. & M. Rld. Co.*, 71 Ill. 106, the plaintiff, Holder, a director, served as treasurer of the railroad company from September 1, 1867, to January 31, 1872. No

salary had been agreed upon for his services. The board of directors then allowed $4,000 for the services he had per- formed to that time. A warrant of attorney was issued, and judgment entered upon it. Upon application of the company, that judgment was set aside, and the company let in to de- fend. Judgment went against him, which was affirmed in the supreme court, which says, page 108:

"Again, they [the board of directors] are managing a fund as trustees for the stockholders, and they have no right to use or appropriate the funds of the *cestui que trust* to themselves. They have no power to waste, destroy, give away or misap- ply it."

And there being no legal obligation, the directors could not allow payment, and the judgment was affirmed. (See also *Gridley v. L. B. & M. Rld. Co.,* 71 Ill. 200; *Kirkpatrick v. Penrose Ferry Co.,* 49 Pa. St. 118; *Butt v. Woods,* 37 N. Y. 317; *Holland v. Bank,* 52 Me. 564.)

In *Maux Ferry Gravel Road Co. v. Branegan,* 40 Ind. 361, the board of directors adopted the following order with ref- erence to services then performed:

"Ordered, the officers of the Maux Ferry gravel road al- low themselves in bonds a reasonable compensation for their services: James M. Alexander and P. K. Parr, $100 each; N. S. Branegan, Will. Ditmars, and Isaac Sawin, $50 each."

Branegan brought suit on his $50 bond, recovered judg- ment, and the supreme court reversed it.

*Illinois Linen Co. v. Hough,* 91 Ill., 63, *supra,* is a case which in its facts is quite similar to this one. Hough was president of the company, and did a large amount of work for it in the management of its business. He testified: "I spent my whole time, while I was president of the company, night and day, except when superintending farm. I pur- chased fiber and looked after whole business, outside and in- side. I averaged about twelve hours per day. My services were reasonably worth $5,000 for eighteen months." The evidence showed he was also largely engaged about his own private affairs, looking after his farm and other affairs of his own. The by-laws of the linen company provided that offi-

cers should receive such salaries as were fixed by the stock-holders. The other officers of the linen company testified that Hough had agreed to serve without pay. He recovered for his salary. The supreme court, on page 67, approves the following instruction as given in the lower court: "Or, if you shall believe from the evidence that it was agreed by the plaintiff and the other officers of the defendant, that they should not charge for or receive any compensation for their services rendered by them, then the plaintiff would not be entitled to recover upon his claim for such services;" and reversed the judgment, remarking that all the officers except Hough testified that he agreed to make no charges for his services.

So, also, the doctrine that an agent cannot contract with himself against the instructions of his principal and to the prejudice of such principal's interests, is also elementary, and abundantly supported by the authorities. It rests upon the most simple and ordinary principles of common honesty. Agency implies trust, and no man may violate a trust. This doctrine applies to the matter of taking unauthorized interest, as well as to the purchase of the Bourbon county bonds. It is true, the testimony as to this last transaction shows that the transfer was made after the defendant became president, and by the then acting cashier. But the jury would be justified in finding that it was by the direction of the defendant as president, and was really a purchase by himself as an individual, from himself as agent of the bank. This doctrine is of universal application. In 1 Story's Eq. Jur., § 323, the author says:

"On the whole, the doctrine may be generally stated that wherever confidence is reposed, and one party has it in his power, in a secret manner, for his own advantage, to sacrifice those interests which he is bound to protect, he will not be permitted to hold any such advantage."

The doctrine has been applied by this court to dealings between an attorney and his client, (*Yeamans v. James*, 27 Kas. 195;) to contracts made by directors of a corporation,

(*Ryan v. Rly. Co.* 21 Kas. 365;) and is unquestionably applicable to the actions of a bank cashier. Morse on Banks and Banking, page 196, says:

"It has never been held that the position of the cashier was precisely that of a legal trustee. Yet the qualities of a trust can never be wholly wanting where an agent has committed to him the management of the property of other persons for definite purposes. To say that he cannot either directly or indirectly use his influence or any of his powers to secure advantages to himself, is only to assert what has never been called in question; and it makes no difference that his conduct was not, or was not intended to be, hurtful to the bank. If he wishes any species of accommodation from the bank, even though he might have power to grant the same to another, he will not be safe in granting it to himself, without express permission from the board of directors. The familiar rule of agency, that one shall not be agent for another party in a contract in which he is himself interested, *a fortiori*, in which he is a principal on the other side, suffices to prohibit this. But further than this, in his own dealings with the bank he is held, like a trustee, to exercise a much greater degree of scrupulosity and thoroughness of regard for the interests of the bank, than in the conduct of like dealings had by other people with it."

In *Austin v. Daniels*, 4 Den. 299, the court, on page 301, says:

"Bank officers are but the agents of the corporation, and if they transcend or abuse their powers, are as much responsible to their principals as are the agents of an individual. This ought to be regarded as too plain to require argument or authority, and I shall offer none."

In *Torrey v. Bank of Orleans*, 9 Paige, 649, the court says, on page 663:

"It is a settled principle of equity, that no person who is placed in a situation of trust or confidence in relation to the subject of a sale can be the purchaser of the property on his own account. And in the recent case of *Greenlaw v. King*, decided in the Court of Chancery in England in January, 1841, (5 Lon. Jur. 18,) Lord Cottenham held that the principle was not confined to a particular class of persons, such as guardians, trustees, or solicitors, but was a rule of universal application to all persons coming within its principle, which

is, that no party can be permitted to purchase an interest where he has a duty to perform that is inconsistent with the character of purchaser."

See also to the same effect, *Butts v. Wood*, 37 N. Y. 317; *Robinson v. Smith*, 3 Paige, 222; *Hale v. Bridge Co.*, 8 Kas. 466; *Gardner v. Ogden*, 22 N. Y. 327; *Goodwin v. Cincinnati & Whitewater Canal Co.*, 18 Ohio St., 169; *Kœhler v. Black River Falls Iron Co.*, 2 Black, U. S. 715. The last case, from the highest court in the land, declares that "the officers and directors of a corporate body are trustees of the stockholders, and in securing to themselves an advantage not common to all the stockholders, they commit a plain breach of duty." (See also Pierce on Railroads, p. 39; *Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.*, 16 Md. 456; *G. C. & S. S. R. Co. v. Kelly*, 77 Ill. 426; *Flint & Pere Marquette Rld. Co. v. Dewey*, 14 Mich. 477; *The People v. Township Board of Overyssel*, 11 Mich. 222; *Minor v. Mechanics' Bank of Alexandria*, 1 Pet. 46.)

We have cited these authorities, not because the two propositions above stated need support, but as indicating to what extent they have been carried. Further, they prepare for a better appreciation of the defenses presented. If we were to follow some of them to their full extent, we might safely concede the premises of defendant's argument, and still deny his conclusions. Thus, if the directors have no power to bind the corporation by a direct vote, granting pay for past services in any capacity to one of their number who agreed to serve without compensation, *a fortiori*, the corporation is not concluded by a presumed ratification through a supposed knowledge and acquiescence on the part of such directors. What cannot be done directly through lack of power, is never accomplished indirectly by silence, acquiescence and ratification. But let us examine the argument of defendant. It may be stated briefly thus: The directors might by a prior vote have authorized everything that defendant did. That which they could authorize, they can ratify. They are conclusively presumed to know the general condition and man-

agement of the bank, and included in this, the receipts and disbursements as in fact made and as shown by the entries on its general books. Therefore the directors knew what defendant was doing, and acquiescing therein, they ratified his actions. We think this argument as applied to the facts of this case is open to several objections. The testimony shows, or tends to show at least, that in fact the directors did not know what defendant was doing, and therefore did not consciously approve and ratify his actions. Now this legal imputation of knowledge cuts both ways. If the directors are, because they are directors, conclusively presumed to know what he, as cashier, is doing and omitting to do, then likewise he, as a director, is conclusively presumed to know what the other directors, as individual officers, and what the board of directors as a whole, are doing or omitting to do. If they know that he is taking funds of the bank without authority, he knows that they do not ratify it. He knows their acts and omissions as well as they his. Indeed, it is more justly and certainly to be presumed that one director knows what his fellows, single or as a board, are doing or omitting, than that the board should know what an executive officer or clerk is doing or omitting. This imputation of knowledge is of course a mere legal fiction, and it makes against as well as for the defendant. If it is good in favor of a director, it is equally good against him. In short, it leaves the parties to rest their rights and liabilities on the actual facts of authority and conduct.

Again, conceding that the legal presumption of knowledge is supported by proof of actual knowledge, and still ratification would not follow as matter of law. The directors may know that a cashier is disobeying the rules of the bank, and still a failure to take immediate action in disavowal does not, as matter of law, operate to ratify and validate such disobedient act. Knowledge and failure to act may be evidence, sometimes very strong and conclusive evidence, of ratification; but still it is only evidence tending to prove a fact which, with other testimony bearing upon the same fact, is generally

to be weighed by the jury rather than by the court. If the act is done under a mistaken belief in the existence of authority, then knowledge with acquiescence for any length of time tends strongly to prove ratification. But if the authority is known to be wanting, if, further, the act is known to be expressly forbidden and to be directly and substantially prejudicial to the interest of the bank, then a failure to take active measures in disavowal may be weak and inconclusive evidence of a ratification. Take the case at bar for illustration: Ignore all matter of presumption, and assume that actual knowledge was conclusively proved; then if from a misunderstanding as to the real agreement, or upon a supposed authority, defendant charged up his salary on the books of the bank and took the money therefor, and the directors, fully aware of this condition of things, made no objection for a series of months, such acquiescence would make strongly in favor of the correctness of defendant's understanding of the agreement, and would be very conclusive evidence of the a ratification of his action. But if both he and they knew that the agreement was plainly that he should act as cashier without other compensation than office, desk, and safe room for his private business, and that notwithstanding this, and without pretense of right, he charged up a salary and took the money therefor, then the failure of the directors to act is far weaker evidence of ratification. It does not tend to show what was the real agreement; for by the supposition, both parties knew the agreement, and that it forbade the defendant's act. Instead of being a ratification of an unauthorized act, it may have been a mere tolerance of a known wrong, and this in consequence of the present pressure of other and more important considerations. Where both parties know that an act is wrong, the failure of one to object to or resist it does not make it right for the other.

But what is ratification? Counsel for plaintiff in error say it is the acceptance by a principal of the acts of one who, without original authority, acted with third parties, in the name of such principal; that it is therefore only a branch of

the doctrine of principal and agent. This is too limited. Burrill, in his Law Dictionary, says that "ratification is the confirmation of a previous act done either by the party himself, or by another; that it is the confirmation of a voidable act," and cites as authority, Story on Agency, §§ 250, 251; and also, 2 Kent's Com., p. 237. One of those citations treats of the relations of principal and agent, the other of the confirmation of the acts of an infant by himself after becoming of age. Bouvier, in his Law Dictionary, gives similar scope to the meaning of ratification. We think, therefore, it will not do to say that it is strictly a branch of the doctrine of principal and agent. It is the confirmation of a voidable act. It is entirely immaterial what that is which renders the act voidable; whether a lack of present power to make a valid contract, as in the case of infancy, or because of fraud and misrepresentation on the part of the other contracting party, or because it is the unauthorized attempt of an assumed agent to bind his principal. Wherever there is a voidable act, confirmation of that act by the party assumed to be bound, is in law a ratification. But in order to constitute a valid ratification there must be knowledge. In Bouvier's Law Dictionary the author says: "The ratification must be voluntary, deliberate, and intelligent, and the party must know that without it he would not be bound." In Story on Agency, § 239, the author says: "Where the principal, upon a full knowledge of all circumstances of the case, deliberately ratifies the acts, doings or omissions of his agent, he will be bound thereby as fully to all intents and purposes, as if he had originally given him direct authority in the premises to the extent which such acts, doings or omissions reach," citing *Hardeman v. Ford*, 12 Ga. 205; *Billings v. Morrow*, 7 Cal. 171; *Rld. Co. v. Gazzam*, 32 Pa. St. 340.

Again, "while the act of an agent, though unauthorized at the time, may become binding upon the principal by ratification and adoption, to make such ratification effectual it must be shown that there was previous knowledge on the part of

the principal of all the material facts and circumstances attending the act to be ratified; and if the principal assent to the act while ignorant of the facts attending it, he may disaffirm it when informed of such facts." (*Express Co. v. Trego,* 35 Md. 47. See also *Combs v. Scott,* 12 Allen, 493.) Indeed, in the very nature of things, this must be true. The effect of ratification is to create a contract; but a contract implies assent, and how can there be assent without knowledge? That by all the books is one of the essentials to a contract; and this brings us to the inquiry as to the matter of knowledge.

Assuming that these acts of the defendant are shown to have been done without previous authority, they would be binding on the bank only, because ratified by it, and no ratification is proved unless knowledge is shown. The directors constitute the governing body of the bank; the bank itself being an incorporeal entity, without power to see or know. The directory constitutes the visible representative, the thinking, knowing head of the bank. Its knowledge and purpose is the knowledge and purpose of the bank; and here we meet the proposition upon which the defendant rests: that the directors are in law conclusively presumed to know the condition of the bank, its business, receipts and expenditures, and all the general facts which go to make up that condition and business, as shown by the entries on its regular books; and in support of this proposition are cited the cases of *Bank v. Rudolph,* 5 Neb. 527; *Rich v. Banks,* 7 Neb. 201; *Bank v. Wulfekuhler,* 19 Kas. 60; *Arlington v. Pierce,* 122 Mass. 270; *Dunn v. St. Andrew's Church,* 14 Johns. 118; *Bank v. Dandridge,* 12 Wheat. 64; Morse on Banks and Banking, pp. 90, 91; Bigelow on Estoppel, 1st ed., p. 549; and Green's Brice's *Ultra Vires,* 2d ed., ch. 6.

In 5 Neb., *supra,* it is said:

"It is insisted that being the vice president and one of the directors of the bank, he was in a situation which required him to *know* the condition of its business, and must be conclusively presumed to have known whether said note had

been paid, or not. No case directly in point has been cited, but we apprehend that the rule contended for is the correct one. In Morse on Banks and Banking, pp. 90, 91, the author thus states the rule: 'The general control and government of all the affairs and transactions of the bank rest with the board of directors. For such purposes the board constitutes the corporation, and uniform usage imposes upon them the general superintendence and active management of the corporate concerns. They are bound to know what is done, beyond the merest matter of daily routine, and they are bound to know the system and rules arranged for its doing.'"

And in Bigelow, *supra*, we find the doctrine thus laid down:

"In accordance with the principles in the above cases, directors of corporations being bound to know the proceedings of the body, cannot escape an estoppel by the allegation of ignorance."

In the case from our own court, Mr. Justice VALENTINE uses this language:

"For while we assume, as a matter of fact, that Wulfe-kuhler knew nothing of the condition or management of the bank, and nothing of the condition of Herman's account with the bank, yet still, as a matter of law, we think we must presume that he knew all about these matters. He was a director and the vice president of the bank, and it was his duty to have such knowledge, and therefore the law will conclusively presume that he had it."

These authorities abundantly establish the proposition that there is as to the directory a certain legal presumption of knowledge as to the transactions, business and condition of the bank, which is conclusive upon the bank, and against the existence of which, as a matter of fact, no testimony will be received. Upon this doctrine rests substantially the burden of the defense. We are not disposed to limit or restrict the scope of this doctrine. It is one founded in public policy, essential to the safety of third parties in their dealings with the bank, and to the protection of the stockholders interested in its welfare and safe management. So far as is necessary to accomplish these results, it should be carefully and strictly upheld; but it should not be carried beyond this, or to such

an extent as to work injury to the bank. Its purpose is to impose the strictest fidelity and watchfulness upon the directors as custodians of a most important and delicate trust; a purpose which would be thwarted if it were turned into an instrument of injury and destruction to the bank and its stockholders.

The directory, as has been said, is the visible representative of the bank. Persons dealing with it meet only this visible representative, and have a right to presume that it knows all of the affairs of the bank, all that the bank as a principal ought to know of its condition and business. On the other hand, the stockholders and depositors — the persons who are pecuniarily interested in the safe management and prosperity of the bank — look to the directors as the chosen guardians of their interests, and have a right to demand of them that they watch over all those interests in their minute details. So that all of these parties have a right to assume that the directors know all the transactions, business and condition of the bank; because they ought to know them, and because otherwise they do not discharge their full duties to these various parties. But as to an officer and director the reason for this conclusive presumption fails, and therefore the presumption itself should not be held to exist. Upon the defendant as director and officer rests the same measure of responsibility as upon all the other officers and directors. He is presumed to know as much as they are presumed to know. He is within the inner circle of the bank's life, and by ordinary attention may in fact know all that is necessary to govern his action, or to measure his duties and obligations. Presumptions are for the benefit of those outside, who cannot in fact know, and who must rely upon the representations and acts of those inside. But for those inside the bank, there is no need of any presumption, and for the simple reason that they are where they may in fact know.

Again, the successful management of a bank requires the fullest confidence and coöperation between the directors and employés. Every fact which each knows, which the other

ought to know, should be told. No one has a right to withhold a fact, within his own knowledge, of interest to the bank, and which ought to be known by any other officer or director; and no rule is wise or should be upheld which encourages secresy in such matters on the part of any officer. If a cashier is taking money, claiming it as salary, he ought to see to it that the directors know the fact; and no rule should be tolerated which makes it profitable for him to take the money secretly and without their knowledge.

Again, no officer should be permitted to enforce his own wrong against his principal, the bank, through the inattention or neglect of any other agents of the bank. Clearly, one agent cannot empower another to do wrong. Can the inattention and neglect of the former make the wrong of the latter effective and remediless? (*Minor v. Bank*, 1 Pet. 46.) Any other rule would put it in the power of the officers of the bank to plunder it enormously in safety. Let the book-keeper and cashier of any bank combine, and it is easy to see how they could for a length of time continue plundering the bank unknown to anyone, and this though every transaction should be entered on the books of the bank. This, which is so obviously possible, as a matter of fact not unfrequently occurs. In such cases, can it for a moment be held that the ignorance of the directors condones the wrong, or leaves the bank without remedy? This it may be said is a glaring illustration, but the principle which underlies this is the same as that controlling the case at bar. If, as a matter of fact, defendant took the office of cashier upon an express contract to receive as compensation therefor nothing but office, desk and safe room for his private business, and did, notwithstanding this contract, without the knowledge and authority of the board of directors, take the money he is charged to have taken, it was as unmistakable and glaring a violation of official duty, as gross a wrong upon the bank and its stockholders, as though a cashier and book-keeper should combine and surreptitiously take from the vaults of the bank the money placed with it by the depositors. The cashier prior to the

defendant was allowed a salary of $1,800.   Supposing he had taken $5,000 out of the vault and charged it to himself on the books of the bank as salary, and the entry had escaped the notice of the directors for a length of time: could not the bank show the fact, and recover the excess? or would the ignorance and carelessness of the directors be equivalent to voting him a salary of $5,000?   Public policy unquestionably withholds its sanction from any doctrine which will work out such pernicious results.   It sustains the doctrine of imputed knowledge on the part of the directors, only so far as will protect the dealings of third parties with the bank, or will prevent the bank from suffering through inattention or wrong from the directors themselves; and will not carry it to the inner management of the bank, or prevent full inquiry as to the facts of any transaction therein, or the actual authority for any act done by its officers.   We think, therefore, the principal ground for the defense cannot be sustained.   As to the other, little need be said.   The fact that the defendant owned four-fifths of the stock, did not authorize him to do with the assets of the bank what he pleased; the directors of the bank, and not he, acted for it.   His ownership of the stock gave him voice only in electing the directors: when elected, his control of the actions of the bank ceased.   If he had taken moneys which belonged to the bank, he could not defend against an action brought by it to recover such moneys by proof that he owned four-fifths of the stock.   Unless he owned all the stock, he could not condone his own wrong or prevent the bank from recovering the full amount, and thus protecting the interests of the lesser stockholders.   In *Hazard v. Durant*, 11 R. I. 196, a suit was brought by a stockholder to compel the president to account for funds belonging to the company, which the president had converted to his own use. The defendant pleaded a ratification, but the court said:

"To hold that a corporation could gratuitously condone or release such a fraud by anything short of unanimous consent, would be monstrous; for it would be in effect to hold that a president or director who can control a majority vote in the corporation, may rob or despoil it with impunity."

In *Bayshaw v. Rld. Co.*, 7 Hare, 129, the vice chancellor says:

"I think the plaintiff in this case has shown that the directors have misapplied and are about to misapply the £100,-000 I have adverted to, that is, the £100,000 raised under the Hadleigh act. No majority of the shareholders, however large, could sanction the misappropriation of this portion of the capital. A single dissenting vote would frustrate the wishes of the majority. Indeed, in strictness, even unanimity would not make the act lawful."

(See also *Kent v. Mining Co.*, 78 N. Y. 159.) And if defendant could not defend against the action of the bank by proof that he owned four-fifths of the stock, if the bank had a cause of action notwithstanding such ownership, we fail to see any principle upon which his sale of the stock destroyed the bank's right of action, or gave him a new defense. It follows from these considerations that the district court erred in sustaining the demurrer to the evidence, and that the judgment must therefore be reversed, and the cause remanded for a new trial.

As this case goes back for a new trial, we desire to add, to guard against any misconception, that we do not agree with all the authorities heretofore cited as to the lack of power on the part of the directors to appropriate money in payment of the salary of the cashier, or other officer, after the services have been rendered, and in cases when such cashier or other officer happens to be a director: we think the rule is, in the absence of positive restrictions, that where no salary is prescribed, one appointed to an executive office, like that of cashier, is entitled to reasonable compensation for his services, and that the directors have power to fix the salary after the expiration of the term of office, and this though such appointee is also a director and continues to be such while holding the independent office.

Again, while we do not think it can be said as a matter of of law, that the directors are conclusively presumed to know the general business and condition of the bank as shown by the entries on its books, in a case of this kind, and thus to

ratify the action of the cashier in fixing his own salary and in taking the funds of the bank in payment thereof, yet we think a question of fact may often be presented which is fairly to be submitted to a jury for its determination, and that is, whether, independent of any proofs of actual knowledge, the action of the cashier has not been so open and long continued and under such circumstances, that it may be inferred as matter of fact that the directors assented to the payment of such salary. We think the question is rather to be treated as a question of fact and to be determined by a jury, as to whether the bank acquiesced in and ratified the action of the cashier, than to be disposed of as a question of law, and dependent upon a purely legal presumption.

We do not care to pursue the discussion further. The judgment will be reversed, and the case remanded for a new trial.

All the Justices concurring.