# GEORGE G. MERRICK

v.

# THE PERU COAL COMPANY.

1. CORPORATION—*may contract with its members.* There is no rule of law which prohibits a shareholder from dealing with the company of which he is a member, or from suing or being sued by it. The president of a private corporation has the right, with his own funds, to purchase notes and drafts of the corporation, and when he does so, he will succeed to all the rights of the prior holders; or he will have the right, when he takes up such indebtedness with his own means, to maintain an action against the corporation for money paid, laid out and expended for its use.

2. SAME—*advances and loans to, by officer.* And if the president of a private corporation advances it money to enable it to carry on its business or make purchases, he can sue it and recover for money loaned.

3. A shareholder or officer of a private corporation has the right to deal with the company in the same manner as strangers, and when he does so, such party acquires the same rights and incurs the same liability as in the case of a contract with a stranger.

4. SAME—*advances by member—presumption.* Where two brothers, contemplating the formation of a private corporation, purchased certain coal lands and mining rights, and agreed when the purchase was made that they were to have an equal interest in the stock of the company, and to make equal payments on account of the purchase and for carrying on the business; and after the incorporation, one of them advanced various sums of money in payment of drafts of the company and in taking up its indebtedness, for which he was credited upon the books of the company: *Held,* in a suit against the company to recover for such advances, that the agreement was intended only to bind each brother to advance equal amounts as loans, and not as donations; and even if this were not so, that the company could not set up such agreement in defense, as it was no party to it. The court could only look to the legal liabilities of the company.

5. If by the recovery for advances the plaintiff should obtain an equitable advantage over his brother by getting more than a fair share of the corporate property, under the agreement to contribute and share equally in the stock and dividends of the company, the brother in equity might have the rights and burdens of each equalized.

6. CORPORATION—*compensation for services of officer.* Unless provision is made for compensation for the services of the president of a corporation in the by-laws or resolutions of the company, such officer will have no right to recover for services.

7. ADMISSION. When an admission involves a conclusion as to the party's legal rights, and does not relate to a particular fact, and where it is manifest that it was made in ignorance of his legal rights, it is entitled to but little weight.

APPEAL from the Circuit Court of LaSalle county; the Hon. EDWIN S. LELAND, Judge, presiding.

Mr. T. LYLE DICKEY and Mr. JOHN C. CHAMPLIN, for the appellant.

Mr. SAMUEL W. FULLER and Mr. G. S. ELDRIDGE, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of debt, brought by appellant, in the LaSalle circuit court, against appellee, at the October term, 1869. The declaration contained several special and the common counts.

There was filed a plea of *nil debet*, payment, set off, and a plea denying the execution of the notes and bills of exchange declared on, verified by affidavit.

At the June term, 1871, a jury was waived and the cause was submitted to the court for trial by consent of the parties. After hearing the evidence, the court found the issues on all of the pleas except set off, which had been withdrawn, for the defendant. A motion for a new trial was entered by plaintiff, but was overruled by the court.

Appellant introduced, after proving the signature, a note of appellee, dated October 2, 1867, signed C. C. Merrick, president of the company, payable in six months, for $3290, payable to the Michigan Car Company, and indorsed to appellant by the payee; also a note of appellee dated the 7th of October, 1868, for $2239.43, payable at 60 days to the Ohio Falls Car and Locomotive Company, signed by Geo. G. Merrick, president. A note of the same kind, same amount and date, payable 90 days after date, with assignments and a receipt of

payment of both of these notes by appellant; also two drafts drawn by C. C. Merrick, president, in favor of the Michigan Car Company, one dated July 1, 1867, for $4920, and the other dated January 4, 1868, for $5166, both assigned in blank by the payee.

Appellant testified that he took up the notes to the Ohio Falls Car Company, each for $2239.43, with his own private funds, one December 10, 1868, and the other January 9, 1869; that he took up the two drafts in the same manner, also other items of account amounting in the aggregate to $30,580.84, after deducting all credits; that these sums were advanced from his own moneys, and the same were paid either to, or for and on account of the company, with the knowledge and approbation of the president thereof; that in December, 1868, and January, 1869, the company purchased cars, and its paper was given therefor, which had matured, and the company having no funds, and appellant being the president, took up the paper with his own means, and caused the amount to be entered to his credit on the books of the company.

Appellant further produced vouchers for the items of his account, and swore to their correctness; and appellee's counsel says that it was not denied, so far as he remembers, that appellant had made most of the payments and performed most of the labor for which he claimed to recover of appellee, but he says the sole question was, whether the payments were made and the labor performed on the credit of the company, and for which it became liable as his debtor, or whether they were made in pursuance of the original agreement between him and his brother for the purchase and operation of the property of the company.

It appears that, in December, 1865, appellant and his brother Charles purchased of T. D. Brewster and E. Higgins certain coal land and mining rights in the city of Peru, in this State, which had belonged to an insolvent mining company known as the Peru Coal Mining Company, which was then in the hands of, and operated by, Brewster & Higgins, and who claimed

to be the principal owners thereof. The terms of the purchase were, that the Merricks were to give $30,600, and to form a new corporation under the general laws of the State, with a capital stock of $1,000,000, and Brewster & Higgins were to have 49-100 of the full paid stock, thus leaving the Merricks owners of a small majority of the stock, giving them the control in the management of the affairs of the company.

The $30,600 was paid pursuant to the agreement, a new corporation was formed in February, 1866, and the stock issued to the parties pursuant to the agreement. The coal lands were conveyed to them, and not to the company, and were so held by them for more than a year, when they were conveyed to the new company.

The Merricks seem to have taken into their hands the full management of the affairs of the company. Charles was elected president of the company, and held the office for two years, when he was succeeded by appellant. He occupied the position until February, 1869, when Charles was re-elected to the place. They, with Brewster, were the directors of the company.

At the time of the sale, Brewster & Higgins owned the large, portion of the stock of the old company, but there were quite a number of shares held by other persons. This outstanding stock, it was subsequently agreed by the Merricks, should be purchased in by Brewster on their account, as far as it could be conveniently done; and the greater portion was thus obtained.

It was understood and agreed between appellant and Charles, when the purchase was made, that they were to have an equal interest in the stock of the company, and to make equal payments on account of the property purchased, and that they would advance the necessary means in equal parts for carrying on the business of the company; and they seem to have had the same understanding in buying the outside stock, which was purchased for them in equal amounts.

On the 8th of April, 1867, a meeting was held, and the stockholders accepted a special charter, granted by the legislature, and, in pursuance of its provisions, the capital stock was then increased to $500,000. The stock was issued for that amount. Charles previously held 482 shares, appellant 482 shares, Brewster 32 shares, and 4 were unrepresented when the increase of the stock was made. On the 30th of December, 1867, Charles held 2420, appellant 2420, Brewster 108, Kales 50, and 2 shares were not issued, making in all 5000 shares. The new stock was issued on the old, four new shares to each one of the old; no money was paid therefor.

An arrangement was entered into between Charles and appellant, as we have seen, before the purchase was made in the first instance, that, as the corporation would be compelled to have money and credit to develop and carry on the enterprise, they were each to advance to the corporation the money for that purpose, and as between themselves they would equalize the advances thus made. The meaning and effect of this arrangement gives rise to this entire controversy. Appellee contends that, under it, neither of the brothers could make the company liable, nor could it become the debtor of either of them. On the other hand, appellant contends that, as the corporation would be compelled to borrow money to a considerable extent, they would advance or loan to it the necessary funds in equal amounts, and as between themselves equalize that amount if one of them should advance more than the other.

As we understand the case, this arrangement was entered into when they owned but a small majority of the stock, and when others, to whom they were under neither any pecuniary nor moral obligation, held almost one-half of the stock. It is true that they subsequently became the owners of all but a trifling amount of the stock of the company, but such was not the case when the arrangement was consummated. When this, together with other circumstances which surround this agreement, are considered, they repel, in the strongest manner, the

presumption that the parties intended to advance such large sums of money to a corporation nearly one-half of the stock of which belonged to others, and thus give near one-half of the benefits derived therefrom in the shape of property and profits to other persons. It looks to us as being almost impossible that such could have been the design. Men are rarely so disregardful of their interest.

On the contrary, if these brothers expected to make the stock of the company valuable, it was natural that they would be willing to loan means to the company from any surplus they had, look to it for repayment, and thus increase their interest in the property and profits of the company. If such was the design, and it is but reasonable to believe it was, then a motive reasonable and fully sufficient to induce such action on their part, is found. Had they, in the beginning, and when the arrangement was entered into, been the sole owners of the entire stock, then we could see that it would be a matter of indifference, on advancing money by either of them to the company, whether it should be charged to the company, or one-half thus advanced charged to the other, as by either mode the result to their interest would have been the same. In such a case, all of the benefits would have enured equally to each of them, and other parties could not have shared in them.

For these reasons, we are of the opinion that the arrangement must have been intended only to bind each to advance equal amounts to the corporation as loans, and not as donations.

The evidence does not show that any other or different arrangement was afterwards made, when they had obtained all but a few shares of the stock, and we will not presume that they intended that the advances then made should be on other or different terms.

But even if such is not the purport of the agreement, and it is as claimed by appellee, does it follow that such an agreement can be interposed as a defense to this action?

Here is a corporate body, having a legal existence, endowed with ample powers to enter into contracts and agreements, of suing and being sued, which has given notes and drafts to persons in nowise connected with it or its organization, and has given notes and drafts which were undeniably binding on it in law—such instruments as the payees and drawees could, beyond all doubt, have sued upon and recovered after their maturity. So could their assignees. And it may be asked why appellant could not recover, when he, in his own individual right, with his private means, purchased these instruments, so far as we can see, in good faith, or, at all events, paid with his individual funds for the use and benefit of the company. It will not be said that he could not recover because he was a stockholder and officer of the company, as both have the right to deal with the company in the same manner as strangers may; and when they do so, each party acquires the same rights and incurs the same liability as would strangers.

There is no rule of law which prohibits a shareholder from dealing with the company, or from suing or being sued by it. It then follows that appellant, notwithstanding he was the president of the company, had the right, with his own funds, to purchase these notes and drafts, and when he did so he succeeded to all of the rights of the holders. Or he, upon taking up, with his own means, such indebtedness, had the right to maintain an action for money paid, laid out and expended for the use of appellee.

It is equally true, that, if he advanced money to the company to enable it to carry on its business, he can sue it and recover for money loaned. Having the right to deal with the company, he had the power to loan it money and to look to it for payment. Such is the well recognized law, and it must control unless prevented by the agreement of C. C. Merrick and appellant, entered into when they first purchased the property.

Whatever may be the rights of these parties, as individuals or as partners, in forming the company as they did, we are

wholly unable to see that appellee can invoke the private agreement of the Merricks to release it from liabilities it has legally incurred and has never discharged. The company was not a party to that agreement, and has no more concern with it than if it had been entered into by persons who neither held stock in, nor were officers of the company.

We can alone look to the legal liabilities of the company, and not to the equities that may exist between appellant and his brother. The corporation, according to the usual course of business, incurred the liability to pay this indebtedness, and has done no act to discharge it from that burthen. It has no right to insist upon the performance of an agreement entered into by two of the shareholders in reference to the terms and conditions that they should purchase and hold stock and loan money to the company. That was their private affair, which in nowise concerned the company.

We must not forget that the company is a separate legal entity existing independently of the Merricks, although they may have owned much the greater portion of the stock. It is fully illustrated, when appellant ceased to be the president and a director in the company. Although he owned nearly one-half of the stock, he was as impotent to control its acts as a stranger owning none of its stock.

Appellant and his brother, had they owned all of the stock, would not have been the company, but would have represented its stock, and would have held the power, by virtue thereof, to designate the persons who should exercise the franchises and powers of the company. They might, no doubt, by the adoption of by-laws, have conferred the power on themselves necessary for its corporate action, but they could not exercise them merely because they were stockholders.

If, by a recovery of a judgment for his advances, appellant would obtain an equitable advantage of Charles by obtaining more than a fair share of the corporate property, under their agreement that they should contribute equally and share equally in the stock and dividends of the company, then he

has,no doubt,the right in equity to have their agreement strictly performed, and their rights and burthens equalized. But those rights can not be adjusted in this proceeding, nor can appellee call upon them to adjust those rights in a suit at law.

It is urged that appellant repeatedly said that the company owed him nothing, or that it owed nothing. From the whole of the evidence in the case, we are of the opinion that these declarations were all made when he supposed that he was compelled to look to his brother for the sum he had advanced in excess of that contributed by him, and under the supposition that he had no power to recover from the company. It is not pretended that he ever admitted that the money advanced by him to and for the company had been paid to him. It is manifest that he made these statements and admissions in ignorance of his legal rights, and, from the evidence, we see nothing that should be held to conclude him from asserting them in this suit.

As to the claim for salary whilst acting as president of the company, we can see no right of recovery. It nowhere appears in evidence that there was any by-law or resolution of the company providing compensation for such services.

In the case of *Am. Cent. R. R. Co.* v. *Miles*, 52 Ill. 174, we held that in the absence of such a by-law or resolution, such compensation could not be recovered for services rendered by a director of a railway company. In principle, no distinction is perceived between the two cases.

All the evidence considered, we are of the opinion that the court below erred in finding the issues for, and rendering. judgment in favor of appellee, and the judgment is reversed and the cause remanded.

*Judgment reversed.*