PEARSON *v.* CONCORD RAILROAD CORPORATION *& a.*

A director of a railroad corporation stands in a fiduciary relation to the corporation, and is under the disability of a trustee.

The relation of stockholders to the corporation being that of *cestuis que trust*, the action of common directors of two railroad corporations, in matters where the interests of the roads conflict, may be enjoined upon a stockholder's bill filed for that purpose.

Where the managers of a railroad corporation, acting in its interests, buy a controlling interest in the stock of a connecting road for the purpose of making with themselves as controlling managers of the latter road contracts more favorable to the former, and accomplish their purpose, the question whether the contracts are fair and just is immaterial in a stockholder's injunction suit to restrain the execution of the contracts.

| 62 | 537 |
| 66 | 273 |
| 62 | 537 |
| 68 | 15 |
| 68 | 341 |
| 62 | 537 |
| 71 | 322 |
| 62 | 537 |
| 74 | 177 |
| 74 | 181 |

In such a case a trustee may be appointed to perform that part of the duty of the directors of the disabled road which they are legally incapacitated to perform.

A railroad corporation cannot become a stockholder in another railroad corporation for the purpose of controlling the business of the latter, or the election of its officers, unless such power is given by statute.

BILL IN EQUITY, in the nature of a bill *quia timet*, filed by John H. Pearson, a stockholder of the Concord Railroad Corporation, in behalf of himself and all other stockholders who may join in the suit, except the defendants, against the Concord Railroad Corporation, John A. Burnham, J. Thomas Vose, Samuel N. Bell, Frederick Smyth, John P. Pitman, James W. Johnson, and Benjamin A. Kimball, its directors, the Northern Railroad, the Concord & Claremont Railroad, the Sugar River Railroad, the Contoocook River Railroad, the Boston, Concord & Montreal Railroad, the Nashua & Lowell Railroad, and the Boston & Lowell Railroad.

The plaintiff prays that, among other things, the contracts mentioned in the referee's report may be set aside and declared void; that the defendants may be forever enjoined from acting under them; that a suitable person or persons may be appointed by the court to act on behalf of the Concord company in all matters where the directors are legally disqualified by reason of their representing adverse interests; for an account, and for general relief.

Facts found by a referee. Lyon was president of the Boston, Concord & Montreal Railroad from 1861 to the time of his death, April 11, 1878, and a director of the Concord Railroad from 1873 until his death, and was a large stockholder in each company. He was succeeded as a director in both companies by Vose, his executor, who has been president of the former since the death of Lyon, and of the latter since the death of Stearns. Stearns died in December, 1878, being at the time of his death president of the Northern and the Concord companies, and having been identified with the former from its beginning, and for a quarter of a century had largely controlled its management. He was elected director and president of the Concord in May, 1873, and held these offices until his death.

The board of directors of the Concord company consisted of seven members, and a majority of the board have been directors of the B., C. & M. and the Northern from the annual meeting in 1874 to the time of the filing of the plaintiff's bill. Stearns and Lyon were, by the yearly votes of the Concord directors, the executive committee of the board, with power to direct the operation of the road, and make all necessary purchases and contracts therefor, subject to the approval of the board, from June, 1873, until they died, when Lyon was succeeded by Vose, and Stearns by Kimball.

Prior to the annual meeting of the Concord in May, 1873,

Stearns and Lyon purchased of Johnson about eight thousand shares of Concord stock, paying therefor $105 or $106 per share, a sum largely in excess of its market value, Johnson procuring the stock from six of the seven persons then composing the board of directors of the Concord company. Since this purchase the Northern has owned stock in the Concord, and has voted thereon at the annual meetings of the Concord, the amount so voted on at the annual meeting in May, 1879, being 1,290 shares. At the time of the purchase, Stearns and other officers of the Northern believed that the managers of the Boston & Lowell Railroad were negotiating for the stock, and feared that it would pass permanently into unfriendly hands. Their apprehensions were material inducements to the purchase, although their fears proved to have been groundless. The purchase was made for the protection and benefit of their respective companies. It was not their purpose, and the result has not been, to reduce the dividends below the amount allowed by law, or to lessen the efficiency or capacity of the road for business or for the accommodation of the public, or to increase the fares or rates for freights, or to allow the property or its market value to depreciate, but the purchase was made with the intent and purpose of obtaining the control of the road, and thereby securing more favorable contracts for the business of the Northern and the B., C. & M. over the lower roads, to which they were entitled. The effect of the purchase was to vest the control of the Concord in the hands of the B., C. & M. and the Northern companies, and to elect common directors, who have controlled the management of the Concord. The directors have acted honestly and fairly in the discharge of their joint duties, but as the result of such directorship the income of the Concord has been diminished, and that of the other companies increased.

In 1865 the Concord entered into a contract with the Nashua and Lowell companies by which the business of the upper roads was forced over those roads at increased rates, and fifty per cent. higher than the Concord paid the Nashua and Lowell companies for the same service, the total increase amounting in twelve years to $61,106.81 to the Concord & Claremont, $38,363.84 to the Northern, and about $130,000 to the B., C. & M. companies. The rates charged were oppressive and unjust. The upper roads remonstrated against and opposed the contract of 1865, but withdrew opposition upon the promise of the then manager of the Concord " that he would make it just as well for the upper roads as though the contract were not executed." The referee does not find that these claims are fraudulent, but finds that the contrary is true, and that their validity has not been denied by the different boards of directors of the Concord company. In 1878 the directors of the Concord voted as a compromise to pay the Northern, for itself and the C. & C. Railroad, the sum of $30,000, and to pay the B., C. & M. the sum of $38,000. The latter road never accepted the offer,

and it does not appear that the Northern ever took any action in regard to the offer to that road.

The contract of 1865 was terminated by the Lowell line prior to April 1, 1877, when the Concord company made contracts with the upper and lower companies, by which it receives the same rates from the upper roads that it pays to the lower roads, and by which the upper pay to the Concord less than under the contract of 1865, and the Concord pays the lower roads more, amounting to about $10,000 a year.

*Bingham & Mitchell, G. Marston, E. Burke,* and *E. B. S. Sanborn,* for the plaintiff.

*Chase & Streeter* and *J. Y. Mugridge,* for C. R. R. and directors.

*Pike & Parsons* and *J. H. Benton, Jr.,* for N. R. R. and C. & C. R. R.

*Barnard & Barnard,* for B., C. & M. R. R.

*J. H. George* and *W. L. Foster,* for B. & L. R. R. and N. & L. R. R.

*W. W. Bailey,* for N. & L. R. R.

SMITH, J.   The gist of the referee's report is, the two upper companies were justly entitled to more favorable contracts for their business over the road of the Concord, and the upper companies (*i. e.,* the managers acting for them and in their interests) bought a controlling interest in the stock of the Concord for the purpose of making with themselves, as controlling managers of the Concord, contracts more favorable to themselves; and they accomplished that purpose.   The upper companies having bought Concord stock for the purpose of controlling that road for their own advantage, having exercised their control of it by making certain contracts with themselves, and having passed the vote of indemnity for their own benefit, the question is whether they can be allowed, against the objection of a stockholder in the Concord, to execute their illegal contracts and their illegal vote, on the ground that the contracts and vote are just and fair, and such as the Concord ought to have made and passed.

A director of a railroad corporation, though not technically a trustee, stands in a fiduciary relation to the corporation, and is under the disability of a trustee.   Practically, the directors are trustees, and the stockholders are the *cestuis que trust.*   Like all other persons where this relation exists, he cannot, as buyer for his corporation, buy of himself against the objection of his *cestui que trust,* nor as seller for the corporation become the purchaser, nor, being its agent and trustee, contract with himself, or secure

to himself advantages not common to other stockholders, because
such contracts and relations are likely to bring him in conflict
with his duty and self-interest, and tempt him to be unfaithful to
the superior obligations he has assumed. Pierce R. R. 36; Mor.
Corp., s. 245; Ang. & A. Corp., ss. 233, note a 312; *Butts* v.
*Wood*, 37 N. Y. 317; *Hoyle* v. *Railroad*, 54 N. Y. 314, 328;
*Blake* v. *Railroad*, 56 N. Y. 485, 490; *Barnes* v. *Brown*, 80 N. Y.
527, 535; *Duncomb* v. *Railroad*, 84 N. Y. 190, 198; *Robinson* v.
*Smith*, 3 Paige 222, 232; *Koehler* v. *Company*, 2 Black 715, 721;
*Bliss* v. *Matteson*, 45 N. Y. 22; 1 Per. Tr., s. 207; *Booth* v. *Robinson*, 55 Md. 419, 436, 440.

The plaintiff is a stockholder in the Concord, and sustains to
the directors of the company the relation of a *cestui que trust.*
He seeks an injunction to prevent the execution of these illegal
contracts and vote. Must he fail because they are, or may be
shown to be, fair and just? On this question the authorities are
not unanimous. One class answers it in the affirmative, some of
them putting upon the trustee the burden of proving fairness. *Coal
& Iron Co.* v. *Parish*, 42 Md. 598; *Ashhurst's Appeal*, 60 Pa. St.
290; *Watts's Appeal*, 78 Pa. St. 370. Others put upon the bene-
ficiary the burden of proving fraud. *Buell* v. *Buckingham*, 16
Iowa 284; *Merrick* v. *Coal Co.*, 61 Ill. 472. The second class
answer it in the negative, and this is the view adopted by the
author in Pierce R. R. 36, who says,—"The rule is so strict that it
does not permit, as against a disapproving *cestui que trust*, an in-
quiry into the good faith and fairness of a transaction which comes
within it." And this is the law as settled in our own decisions.

In *Currier* v. *Green*, 2 N. H. 225, this court, speaking through
*Richardson*, C. J., said that the rule that the agent of another in
the sale of an estate is incapacitated to make a contract, which
shall give him an interest in the purchase, "is founded on general
principles of public convenience. As no court could be able in
many cases to ascertain the truth, a contract of this kind is not
permitted in any instance, however honest the circumstances may
be, the general interests of the public requiring that it should be
held to be invalid in every instance;" and he concluded by quot-
ing from Sug. Vend. 392, as follows: "He that is entrusted
with the interest of others cannot be allowed to make the busi-
ness an object of interest to himself, because from the frailty of
nature one who has the power will too readily be seized with the
inclination to use the opportunity for serving his interest at the
expense of those for whom he is interested."

In *Perkins* v. *Thompson*, 3 N. H. 144, 146, the same learned
judge said,—"If it were once decided in this court that a sheriff
might be interested lawfully in the purchase of articles he himself
was selling upon an execution, it would open an avenue to frauds
for the detection of which our courts have very inadequate means.
And it seems to us that every principle of public policy requires

that we should at once close this avenue forever by holding that in no case can a sheriff be interested in the purchase of an article he is selling as a public officer, and by treating every such purchase as voidable, at the election of the debtor." See, also, *Brackett* v. *Tillotson*, 4 N. H. 208.

In *Remick* v. *Butterfield*, 31 N. H. 70, 87, 89, where the administrator overbid the purchaser in the hope of getting a higher bid, and then persuaded him to take it off his hands, Mr. Justice *Bell* said,—" We regard the whole transaction as dangerous and improper, and as illegal, giving no right to the administrator to hold the property, or to claim any conveyance under his bid." And, again : " It is an abuse of authority which may be taken advantage of by any one whose interest is affected. Hence *cestuis que trust*, and all for whom the trustee or agent acted, have an option to avoid the sale and retain the property sold, or to confirm the sale and receive the consideration, as may be for their interest." See *Hoitt* v. *Webb*, 36 N. H. 158, 163 ; *Sparhawk* v. *Allen*, 21 N. H. 9, 22–25 ; *French* v. *Currier*, 47 N. H. 88, 98 ; *Hoit* v. *Russell*, 56 N. H. 559, 564 ; *Ashuelot R. R.* v. *Elliot*, 57 N. H. 397, 433–437, 439–442.

It hardly seems necessary to go to the reports of other jurisdictions for confirmation of a doctrine so firmly established in our own reports. There is a partial review of some of the leading cases in the opinion of *Gilchrist*, C. J., in *Sparhawk* v. *Allen*, 21 N. H. 9, 22–25. They confirm the doctrine as held in this state. It has been uniformly so held in England since the decision in *Holt* v. *Holt*, 1 Ch. Cas. 190, decided in 1670.

Judge *Story* says, if " the seller were permitted, as the agent of another, to become the purchaser, his duty to his principal and his own interest would stand in direct opposition to each other, and thus a temptation, perhaps in many cases too strong for resistance by men of flexible morals, or hackneyed in the common devices of worldly business, would be held out, which would betray them into gross misconduct, and even into crime. It is to interpose a preventive check against such temptations and seductions that a positive prohibition has been found to be the soundest policy, encouraged by the purest precepts of Christianity." Sto. Ag., *ss.* 210, 211. And, again : " The principle applies, however innocent the purchase may be in a given case. It is poisonous in its consequences. The *cestui que trust* is not bound to prove, nor is the court bound to decide, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power distinctly and clearly to show it. It is to guard against this uncertainty and abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust* to come at his own option, and, without showing essential injury, to insist upon having the experiment of another sale." 1 Sto. Eq. Jur., *s.* 322.

Parsons lays down the rule thus: "If an agent to sell become the purchaser, or if an agent to buy be himself the seller, a court of chancery, upon the timely application of the principal, will presume that the transaction was injurious, and will not permit the agent to contradict this presumption, unless, indeed, he can show that the principal, when furnished with all the knowledge he himself possessed, gave him previous authority to be such buyer or seller, or afterwards assented to such purchase or sale." 1 Pars. Con. 87, and cases cited, viz., *Coles* v. *Trecothick*, 9 Ves. 234, 247; *Lowther* v. *Lowther*, 13 Ves. 103; *Ex parte Hughes*, 6 Ves. 617; *East India Co.* v. *Henchman*, 1 Ves. Jun. 289; *Ex parte Bennett*, 10 Ves. 385; *Oliver* v. *Court*, 8 Price 127; *Fox* v. *Mackreth*, 2 Bro. C. C. 400; *The York Buildings Co.* v. *Mackenzie*, 8 Bro. P. C. 42; *Molony* v. *Kernan*, 2 Dru. & War. 31; *Murphy* v. *O'Shea*, 2 Jones & La T. 422; *Davoue* v. *Fanning*, 2 Johns. Ch. 252; *Moore* v. *Moore*, 5 N. Y. 256; *Conger* v. *Ring*, 11 Barb. 356; *Cumb. Coal & Iron Co.* v. *Sherman*, 30 Barb. 553; *McConnel* v. *Gibson*, 12 Ill. 128; *Pensonneau* v. *Bleakley*, 14 Ill. 15; *Dwight* v. *Blackmar*, 2 Mich. 330; *Clute* v. *Barron*, 2 Mich. 192; *Allen* v. *Bryant*, 7 Ired. Eq. 276; *White* v. *Trotter*, 14 Sm. & M. 30; *Michoud* v. *Girod*, 4 How. 503; *Green* v. *Sargeant*, 23 Vt. 466; *Buell* v. *Buckingham*, 16 Iowa 284. See, also, *Holt* v. *Holt*, 1 Ch. Cas. 190; *Hatch* v. *Hatch*, 9 Ves. 297; *Whelpdale* v. *Cookson*, 1 Ves. Sen. 9; *Hall* v. *Brown*, 3 Bro. C. C. 177; *Keech* v. *Sandford*, 2 Eq. Cas. Abr. 741; *Aberdeen R'y Co.* v. *Blaikie*, 1 Macq. 461; *Lewis* v. *Hillman*, 3 H. L. Cas. 607, 629, 630; *In re Bloye's Trust*, 1 Macn. & G. 488, 495; *Ex parte James*, 8 Ves. 337; *Ogden* v. *Murray*, 39 N. Y. 202, 208; *Torrey* v. *Bank*, 9 Paige 649, 664; *Gardner* v. *Ogden*, 22 N. Y. 327; *Jewett* v. *Miller*, 10 N. Y. 402, 405; *Duncomb* v. *Railroad*, 84 N. Y. 190, 199; *Coleman* v. *Railroad*, 38 N. Y. 201; *Barnes* v. *Brown*, 80 N. Y. 527; *Van Epps* v. *Van Epps*, 9 Paige 237, 242; *Bergen* v. *Bennett*, 1 Cai. Cas. 19; *Munro* v. *Allaire*, 2 Cai. Cas. 183; 4 Kent Com. 438; *Raisin* v. *Clark*, 41 Md. 158— S. C., 20 Am. R. 66; *Yeackel* v. *Litchfield*, 13 Allen 417; *Rice* v. *Wood*, 113 Mass. 133, 135; *Marsh* v. *Whitmore*, 21 Wall. 178, 183; *Wardell* v. *Railroad*, 103 U. S. 651, 658; *Goodin* v. *Canal Co.*, 18 Ohio St. 169; *Railroad* v. *Kelly*, 77 Ill. 426; *Harrington* v. *Victoria Dock Co.*, L. R. 3 Q. B. D. 549.

The reasons for the exclusion of all inquiry into the *bona fides* of the transaction are expressed in these cases with clearness and exactness. Mr. Justice *Field* said,—"The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and constituted as humanity is, in the majority of cases duty would be overborne in the struggle." *Wardell* v. *R. R. Co.*, 103 U. S. 651; *Marsh* v. *Whitmore*, 21 Wall. 178, 183. "It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form." *Jewett* v. *Miller*, 10 N. Y. 402, 405. "The rule is

founded in the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as trustee in his fiduciary character." *Duncomb* v. *R. R. Co.*, 84 N. Y. 190, 199. "It is founded in the danger of imposition, and the presumption of the existence of fraud which is inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation." *Van Epps* v. *Van Epps*, 9 Paige 237, 242; 4 Kent Com. 438. Lord *Eldon* gave as a reason "that the inquiry is so easily baffled in a court of justice." *Hatch* v. *Hatch*, 9 Ves. 297. Lord *Hardwicke* said,—"It is not enough for the trustee to say 'you cannot prove any fraud,' as it is in his power to conceal it." *Whelpdale* v. *Cookson*, 1 Ves. Sen. 9.

In *Hughs* v. *Watson*, decided in Scotland in 1846, cited in *Gardner* v. *Ogden*, 22 N. Y. 327, 347, Lord *Jaffrey* said,—"It is now *presumptio juris et de jure*, that where a person stands in these inconsistent relations of both buyer and seller there are dangers, and it is not relevant to say that it is impossible there could be any in the particular case." Lord *Cranworth* said,—"It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal, with the estate or interests of those for whom he is trustee may have been as good as could have been obtained from any other person: they may even at the time have been better. But still, so inflexible is the rule that no inquiry on that subject is permitted." *Railway Co.* v. *Blaikie*, 1 Macq. 461. The English authorities on this subject are numerous and uniform. Nothing less than incapacity is "able to shut the door against temptation, where the danger is imminent and the security against discovery great. The wise policy of the law has therefore put the sting of disability into the temptation as a defensive weapon against the strength of the danger which lies in the situation." *The York Buildings Co.* v. *Mackenzie*, 8 Bro. P. C. 42; *Davoue* v. *Fanning*, 2 Johns Ch. 252, 270.

In *Michoud* v. *Girod*, 4 How. 503, 557, the court said,—"We are aware that cases may be found in the reports of some of the chancery courts in the United States in which it has been held that an executor may purchase, if he be without fraud, any property of his testator, at open and public sale, for a fair price, and that such purchase is only voidable, and not void, as we hold it to be. But, with all due respect to the learned judges who have so decided, we say that an executor or administrator is, in equity, a trustee for the next of kin, legatees, and creditors, and that we have been unable to find any one well considered decision   .   .   . to sustain the right of an executor to become the purchaser of the property which he represents, or any portion of it, though he has done so for a fair price, without fraud, at a public sale."

This case is within that class where the agent to sell is precluded by the policy of the law from purchasing. The Northern,

B. C. & M., and Concord companies are connecting roads.  The
upper companies have the right by statute to require the Concord
to haul their passengers and freight over its road upon paying
reasonable tolls therefor, and in turn they are required to do the
same for the Concord.  Rates for such transportation must be
fixed by contract, or by referees appointed by the court upon peti-
tion of one of the parties.  G. L., c. 164, ss. 3–9.  The statute has
provided a remedy, simple, adequate, inexpensive, expeditious, and
effectual.  The upper companies, feeling aggrieved by the tolls
charged by the Concord, declined to seek redress under the stat-
ute, but sought a remedy by disabling the Concord to contract
with them, and undertook to contract with a board of directors
elected by themselves.  The relation of the upper companies to
the Concord was that of buyer and seller.  The upper companies
desired to purchase of the Concord the transportation of their
freight and passengers over the road of the latter.  The Concord
desired to sell the transportation over its own road of the traffic of
the upper roads.  It was for the interest of the upper companies
to procure the lowest rates, and their directors were bound to use
the knowledge they had derived from the confidence reposed in
them as directors to attain that result; and the interest of the
Concord was to procure the highest rates, and its directors were
bound to use their special knowledge for the advantage of that
company.  Their interests being conflicting, it was impossible for
common directors to procure the lowest rates for one party and
the highest rates for the other.  " No man can serve two masters."
They were not arbitrators, called in to adjust conflicting claims,
nor were they disinterested.  The referee has found that the pur-
chase of Concord stock at prices largely in excess of its market
value was made with the intent and purpose of obtaining control
of the Concord, and thereby to secure more favorable contracts for
the business of the upper companies over the lower.  The plan
was formed, the purchase was made, the control of the Concord
was obtained, and more favorable contracts were secured.  By
taking the control of the Concord, the upper companies disabled it
as a contracting party.  In fixing the rates of that company for
their business, they were contracting with themselves.  When a
transaction is a fraud in law, it is unnecessary to prove a fraud
in fact, nor is it permissible to show that the transaction was an
honest one.  *Coburn* v. *Pickering*, 3 N. H. 415.  The justness of
the contracts made with themselves and of the votes they passed
as directors of the Concord Railroad for their own benefit does
not impart any validity or legality to those contracts or votes.  If
such contracts were to stand until shown to be fraudulent and cor-
rupt, the result, as a general rule, would be that they must be
enforced in spite of fraud or corruption.  *Railway Co.* v. *Dewey*,
14 Mich. 477.

A plea in trespass *qu. cl.*, that the defendant was a creditor of

the plaintiff, and entered upon his farm to take the crops in payment of his debt, is no better in ethics than in law. If the defendant in replevin or trover were to defend upon the ground that he was a creditor of the plaintiff, and took the goods in payment of his claim, he would scarcely need to be informed that the justness of his claim would be utterly immaterial upon the question of his right to enforce payment by committing a tort. A person may require a common carrier to transport his goods for a reasonable compensation. His refusal does not justify the former in seizing his teams, fixing reasonable rates, and compelling the carrier's servants to transport his goods at such rates. The reasonableness of the rates so fixed would impart no validity to the compulsory process employed in fixing them. A guardian cannot contract with himself for the rent of his ward's real estate, or for the use of his ward's mill, nor resolve to compensate himself out of his ward's money, for wrongs done him by his ward before he was put under guardianship. It would be immaterial whether or not he obtained the appointment of guardian for the purpose of making the contract, or of obtaining the compensation. The fairness and justness of the contract, and of the resolution formed by him as guardian for his own benefit, would not be a ground on which the illegal contract and resolution could be maintained by the guardian against his ward.

The immediate government and direction of the affairs of the Concord Railroad are, by its charter, vested in a board of seven directors, to be chosen by the members of the corporation. In the exercise of the director's powers the stockholders have no voice and no vote. They are as powerless as a ward in the hands of a guardian annually elected by himself. The law requires of a guardian self-denial, integrity, diligent attention, an eye single to the interest of his ward, and that he be above mercenary motives (*Sparhawk* v. *Allen*, 21 N. H. 9, 26)—qualities no less requisite in a director in the discharge of his duty. To whom shall the stockholders look with confidence that their interests will be protected but to their directors? And when the stockholders' interests are sacrificed, or threatened, they may have no other resort for adequate protection except to a court of chancery. This is a case where equity is called upon to interpose its aid in behalf of the stockholders. *March* v. *Railroad*, 40 N. H. 548, 567.

The question whether the contracts made by the defendants for rates over the lower roads are fair and just, and whether the upper companies have valid and legal claims against the Concord, cannot be litigated or contested with the upper companies by a board of Concord Railroad directors whose interests are opposed to those of the Concord, and are in harmony with those of the upper companies.

In the making of these contracts, and in the settlement of these claims, the stockholders of the Concord have the legal right to the

services of directors whose interests are not hostile to their interests. A director or stockholder in the Northern or B. C. & M. company is not such a director. It may, for most purposes, be convenient and desirable that the same person or persons should act as directors of two or more roads forming parts of a continuous line. For many purposes their interests are not adverse. The harmonious working of the several parts, when a large portion of its business is the transportation of goods and passengers over the whole line, requires unity of purpose and management. *Burke* v. *Concord R. R.*, 61 N. H. 160, 233, 234. But however all this may be, the right of the stockholders of a single road, that it shall be operated primarily in their own interest, cannot be overridden or displaced by directors occupying inconsistent relations.

In England parliament has declared by statute (8 & 9 Vict., *c.* 16) that no person interested in any contract with a corporation shall be capable of being a director thereof, and if any director shall directly or indirectly be concerned in any contract with the corporation, his office shall become vacant. The office becomes vacant, although in a suit at law between the parties upon such a contract the contract is not held void. *Foster* v. *Railway Co.*, 13 C. B. 200. Such contracts are voidable in equity at the suit of a stockholder. We have no such statute; but reason and commonsense, and all the analogies of the law, forbid that a person should act in a position of trust when self-interest conflicts with duty. The consciences of men in such positions will not stand the strain of self-interest. We approve the remarks of *Welch*, J., in *Goodin* v. *Canal Co.*, 18 Ohio St. 169: "A director whose personal interests are adverse to those of the corporation has no right to be or act as a director. As soon as he finds that he has personal interests which are in conflict with those of the company, he ought to resign. No matter if a majority of the stockholders as well as himself have personal interests in conflict with those of the company. He does not represent them as persons, or represent their personal interest. He represents them as stockholders, and their interests as such." *Rolling Stock Co.* v. *Railroad*, 34 Ohio St. 465, was a stockholders' bill for an injunction. The plaintiff's board of five directors were members of the defendant's board of thirteen. The bill was dismissed because not seasonably brought; and the remarks of the court, to the effect that the agreement sought to be set aside was valid because executed by a majority of the board without the interested directors, would seem to be *dicta*. *Ashhurst's Appeal*, 60 Pa. St. 291, and *Watts's Appeal*, 78 Pa. St. 370, are sometimes cited to the point that contracts or sales, made by a board of directors with or to some of their number, may be sustained in equity, and the remarks of the court are to the point that such contracts and sales may be upheld if their perfect fairness is shown. These cases were stockholders' bills to set aside sales of property, upon the ground of a violation of fiduciary duty.

Relief was denied upon the ground that the applications came too late.

*Flagg* v. *Railway Co.*, 20 Blatch. 142—*S. C.*, 21 Am. Law Reg. 775—decides that where an agreement is made by the directors' relinquishing the right to a guaranty of dividends to a corporation by another corporation, the execution of the agreement will not be enjoined at the suit of a stockholder, because three of the directors voting were also stockholders in the guarantor corporation, it' appearing that, without counting their votes, a majority of the directors voted for the measure.

In *Butts* v. *Wood*, 38 Barb. 181—*S. C.*, 37 N. Y. 317—the action of the majority of two in a board of three, passing upon the claim of a third director, who also voted, was set aside at the instance of one of the stockholders. See, also, *Wardens of St. James* v. *Rector &c. Ch. of the Redeemer*, 45 Barb. 356; *Kitchen* v. *Railroad*, 69 Mo. 224; *Railroad* v. *Kelly*, 77 Ill. 426; *Koehler* v. *Black &c. Iron Co.*, 2 Black 720; Mor. Corp. 245, and cases; 1 Per. Tr., s. 207, and cases; Pierce R. R. 36–40, and cases; Green Bri. Ult. V. 477, *n.* (a) and cases. Stockholders and creditors are entitled not only to the vote of a director in the board, but to his influence and argument 'in discussion. *Ogden* v. *Murray*, 39 N. Y. 202, 207; *Railway Co.* v. *Blaikie*, 1 Macq. (H. L. Cas.) 461, where the court said, "It was Mr. Blaikie's duty to give his co-directors, and through them to the company, the full benefit of all the knowledge and skill which he could bring to bear on the subject." In *Barnes* v. *Brown*, 80 N. Y. 527, 536, the court said,—"If he [plaintiff] had attempted to perform the contract while he was director, the stockholders could probably have intervened by some suit in equity adapted to the nature of the case to nullify the contract as to him, or to restrain him as to the performance thereof, or to compel him to elect to resign his office of director, or to give up the contract."

Our conclusion upon this part of the case is, that the directors of the Concord could not make the contracts with the upper companies, nor settle the claims of those companies against the Concord. For the transaction of that part of the business of their office they were disabled by the understanding on which, the purpose for which, and the interest in and by which, they were elected.

The case finds that the Northern Railroad is the owner of 1,290 shares of Concord Railroad stock, purchased in 1873, upon which it has since voted at the meetings of the Concord Railroad. A corporation cannot become a stockholder in another corporation, unless such power is given it by its charter or is necessarily implied in it (*Franklin Co.* v. *Bank*, 68 Me. 43, *Bank* v. *Agency Co.*, 24 Conn. 159, Green Bri. Ult. V. 91, and cases cited, Mor. Corp., *s.* 229 and cases cited), especially if the purchase be for

the purpose of controlling or affecting the management of the other corporation. *Sumner* v. *Marcy*, 3 W. & M. 105; *Central R. R. Co.* v. *Collins*, 40 Ga. 582; *Hazlehurst* v. *Savannah &c. R. R. Co.*, 43 Ga. 13; *G. N. R'y Co.* v. *E. C. R'y Co.*, 21 L. J. Ch. 837; *Booth* v. *Robinson*, 55 Md. 419, 439. Dealing in stocks is not expressly prohibited in the act of congress providing for the organization of national banks (U. S. Rev. St., *s.* 5136, par. 7), but such prohibition is implied from the failure to grant the power. *Bank* v. *Bank*, 92 U. S. 122, 128. Corporations are creatures of the legislature, having no other powers than such as are given to them by their charters, or such as are incidental or necessary to carry into effect the purposes for which they were established. *Downing* v. *Mt. W. Road Co.*, 40 N. H. 230, 232; *Trustees* v. *Peaslee*, 15 N. H. 317, 330; *Beaty* v. *Knowler's Lessee*, 4 Pet. 152; *Perrine* v. *Company*, 9 How. 172; *Bank* v. *Earle*, 13 Pet. 519; *Trustees Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636.

Certain classes of corporations, such as religious and charitable corporations, and corporations for literary purposes, may rightfully invest their moneys in the stock of other corporations. The power, if not expressly mentioned in their charters, is necessarily implied, for the preservation of the funds with which such institutions are endowed, and to render their funds productive. So an insurance company or savings-bank may rightfully invest its capital or deposits in the stocks of railroad companies, banks, manufacturing companies, and similar corporations. The power is necessary to enable them to engage in the business for which they are organized, and hence is implied, if not expressly granted, in their charters. Such investments are in the line of their business. On the other hand, a manufacturing or railroad corporation is incorporated to do the business of manufacturing, or transporting passengers and merchandise. Investing their funds in that of other corporations is not in the line of their business. Under extraordinary circumstances it may become necessary for a national bank, or a manufacturing corporation, or a railroad corporation, to acquire stock in another corporation, as in satisfaction of a valid debt, or by way of security, but with a view to its subsequent sale or conversion into money so as to make good or redeem an anticipated loss. *Bank* v. *Bank*, 92 U. S. 128; *Fleckner* v. *Bank*, 8 Wheat. 351.

In *Hodges* v. *N. E. Screw Co.*, 1 R. I. 312, the court said there was no doubt the defendant company might have taken the stock in the Iron Company in payment for its rolling-mill, if it had been taken with a view to sell again, and not permanently to hold it.

The Northern Railroad by its charter was vested with all the powers necessary to carry into effect the purposes and objects of its incorporation, subject to the laws in relation to corporations and railroads contained in the Revised Statutes. The objects of its incorporation are declared to be the accommodation of the

public travel, and the transportation of goods and merchandise. Laws 1844, *c.* 190. It was not contemplated that more funds would be raised by the issue of stock than was necessary to construct and equip its road. The provision that when the net receipts shall amount to a sum making, with the prior net receipts of the corporation, more than an average of ten per cent. per annum from the commencement of its operations, the excess shall be paid into the treasury of the state, is evidence that the legislature never contemplated the accumulation of a fund from its earnings, or from loans, or from the issue of stock, to be invested in the stock of another railroad corporation. It can no more make a permanent investment of funds in the stock of another road than it can engage in a general banking, manufacturing, or steamboat business. It is neither incidental to the purposes of its incorporation, nor necessary in the exercise of the powers conferred by its charter. If it can purchase any portion of the capital stock of the Concord company, it may buy up the whole, and thus engage in a business for which its charter gives it no authority. And what would hinder a banking corporation from becoming a manufacturing company, or a manufacturing company from becoming a railroad common carrier?

But the facts in this case go further. The stock was bought at $105 or $106 per share (par value, $50), a price largely in excess of its market value, and for the purpose of obtaining control of the Concord, and securing more favorable contracts to itself. In *Sumner v. Marcy*, 3 W. & M. 105, the corporation was chartered to deal in lumber, with a capital of $150,000, of which only $75,000 could be invested in personal property, and took stock in a bank to the value of $168,000, for the purpose of getting control of the bank—a clear violation of its charter, but no more so than in this case. The purchase by a corporation of stock in another corporation will be enjoined at the instance of stockholders, when it involves a misapplication of corporate funds, or is a mere speculation, or is induced by a vicious purpose. Pierce R. R. 505. If the investment by one railroad corporation of more than $135,000 in the stock of another at prices exceeding its market value, for the purpose of controlling such corporation for its own benefit, is not a misapplication of corporate funds, it would be difficult to find a case where such investment would be.

 The law does not suffer a trust to fail for want of a trustee. This principle applies as well when, without legal remedy, the fiduciary failure would be partial as when it would be total. In this case the failure would be partial. The trustees, namely, the directors of the Concord company, are disabled to perform their official duty of managing the trust fund, namely, the property and business interests of that company, only so far as the dealings between that and the upper companies are concerned. The plaintiff has not shown that the trustees are incompetent to manage the

other affairs of the trust, or that there is danger of the other affairs being mismanaged. His protection should be commensurate with the fiduciary disability and the danger shown to exist. For the legal incapacity of the trustees to deal with the upper companies the plaintiff is entitled to a complete remedy that will prevent a partial failure of the trust. This requires not a removal of the trustees (directors), but the provisional appointment of a trustee (one or more) for the performance of that part of the duty of the present directors which they are legally incapacitated to perform. The court will appoint a trustee to manage those affairs of the Concord which are subjects of controversy in this suit, and which the directors of the Concord are held by this decision to be legally disabled to manage. And an injunction is granted against the execution by the directors of the vote to pay sums of money to the upper companies upon claims made by those companies against the Concord company. It will be the duty of the trustee appointed under this decision to manage the trust so far as it involves dealings with the upper companies in relation to those claims and all other claims between those companies and the Concord, in relation to terms of connection and transportation, past, present, and future.

The roads must be run upon some terms of connection and transportation; and the existing terms will be allowed to continue until they are terminated by the trustee now to be appointed, or in some other legal manner. To the control and management of such trustee the interests of the Concord company in that behalf are transferred.

The selection of a trustee remains to be made. If the parties agree on a suitable person for that position, they can report the same for consideration. As the trustee will have possession of no property, a fiduciary bond will not be required.

It may be necessary to go further than this decision goes; but such necessity does not now appear. If the remedy now given is found by experience, or, on further consideration, to be inadequate, it will be supplemented by such action as the case requires.

*Decree accordingly.*

DOE, C. J., ALLEN and CLARK, JJ., concurred. STANLEY, BLODGETT, and CARPENTER, JJ., did not sit.